THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* GLENN D. WARMACK, Defendant-Appellant.

First District (5th Division)   No. 77-1705

Opinion filed July 6, 1979.

James J. Doherty, Public Defender, of Chicago (James H. Reddy, Assistant Public Defender, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger and Linda Dale Woloshin, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE MEJDA delivered the opinion of the court:

Following a jury trial, defendant was found guilty of murder (Ill. Rev. Stat. 1973, ch. 38, par. 9—1) and attempt armed robbery. (Ill. Rev. Stat. 1973, ch. 38, par. 8—4 and 18—2.) He was sentenced to a term of 30 to 75 years for the murder conviction and 5 to 15 years for the attempt armed robbery conviction, the sentences to run concurrently.

On appeal, defendant contends that: (1) he was not proved guilty beyond a reasonable doubt; (2) the trial court improperly precluded defendant from impeaching one of the State's witnesses with a prior felony conviction; (3) the prosecutor made improper statements in opening argument and failed to offer any proof of the statements; (4) it

was reversible error to admit certain hearsay testimony; (5) he was improperly required to model clothes identified as those worn by the assailant; and (6) the court improperly allowed a photograph of defendant indicating a prior arrest to be viewed by the jury. We reverse and remand. The pertinent facts follow.

In his opening statement, the Assistant State's Attorney commented on what he felt the evidence introduced would show. After describing the offense, the victim and what he expected the testimony of several witnesses to be, he said, "I believe there will be additional evidence that will be brought to this courtroom because you will learn that certain clothing was recovered in the case, *clothing belonging to that man, the Defendant.*" (Emphasis added.)

The following witnesses were called and testified:

*For the State*

Felma King. She was married to the victim, Willie D. King, and he owned a record store located at 5921 South Halsted (Dusty Records). On May 28, 1976, he drove her to the El at about 8:30 a.m. She next saw him at the Cook County Morgue at about 3 p.m. He was dead.

Martha Morrow. On May 28, 1976, she visited the Dusty Records shop between 9:30 and 10 a.m. She knew Mr. King and had stopped at the shop about 10 to 15 times previously. She was still in the store at about 11:20 a.m. when she noticed someone approach the store on a yellowish bike. He got off the bike and entered the store. He was a black man, between 18 and 24 years old, and wore a black hat with a bill down the front, a hoop-style gold, pierced earring, a short, dark waist jacket with a button on each side, and black pants. The witness was then shown several articles of clothing, including a short waist coat, a pair of pants, a pair of suspenders, a sweatshirt, and a black hat with a small bill. She identified the pants, jacket and cap as the same ones worn by the assailant. She then identified the defendant as the assailant.

Ms. Morrow stated that when the assailant entered the store only she and Mr. King were in the store. The assailant asked Mr. King for a Fats Domino record and when Mr. King looked for the record, the assailant put one arm around Ms. Morrow's neck and held a gun in the other hand. He told them not to move. At this point Ms. Morrow looked at the assailant's face. Mr. King turned around and the assailant shot him. The assailant said, "Money" and then left the store quickly. He rode his bike towards 60th and Halsted. Mr. King told Ms. Morrow to call a policeman. She left the record shop and told a man at a barber shop that Mr. King had been shot.

About four days later she was shown eight photographs by the police from which she picked one. At trial, eight photographs were shown to her

which she identified as being the same photos she had been shown previously. She again picked the same photograph as the picture of the assailant, which was a photo of the defendant.

On cross-examination Ms. Morrow admitted that when the police came, she told them her name was Denise Brown. She also told the police that the assailant was between 5'4" to 5'6" tall and between 120 and 140 pounds. In court, she estimated the defendant's height to be 6'4" or 6'5". In addition, the first time she saw the photographs she did not pick any of them as that of the assailant. Later the same day the police returned, and Ms. Morrow then selected a photo of the defendant. She also admitted that she saw the assailant for a total of two to three seconds and that prior to trial she had told defense counsel that the only time she saw the killer was for a "split second" before he came in the store.

On redirect, Ms. Morrow stated that while she told the police her name was Denise Brown she gave them her correct phone number. She gave a false name because she did not want to get involved and because of fear.

It was stipulated that if Dr. Tilong An were called as a witness, he would testify that on May 29, 1976, he was a licensed pathologist employed by the Cook County Coroner's Office. On that date he performed an autopsy on Willie King, and it was his opinion that the cause of death was a bullet wound of the chest lacerating the lung and heart.

Before the next witness, Edna Scott, was sworn, the State made a motion *in limine* to prevent the defense from impeaching Edna Scott with her prior convictions for attempt armed robbery on March 7, 1966, and soliciting for prostitution in 1968. The motion was allowed. The defense objected to this action and sought a mistrial which was denied.

Edna Scott. On May 28, 1976, she was approaching the record shop when she heard a shot. She saw a young man in his twenties leave the record shop. He was about 5'9" tall and weighed about 155 to 160 pounds. He was wearing a black cap, black trousers and a black jacket with a belt around it. He got on a black bicycle with yellow decorations on the wheel and started down Halsted towards 59th Street, but then turned around and went to 60th Street and then east.

The next day she contacted the police. After viewing about 25 pictures, she picked one she believed to be the assailant, but requested to see him in person to make a more positive identification. About two days later, she viewed a six-man lineup. At trial, she was shown a photograph of the lineup she had viewed. She circled the head of the individual she had identified at the lineup. She then identified the defendant as that man, and as the man she saw leaving the record store. She was shown the articles of clothing which she identified as those worn by the assailant.

On cross-examination Ms. Scott denied having picked a photo of one

Earl Jackson as the assailant. She further stated that at the lineup she viewed the same lineup twice. The first time, although she identified defendant, he wore "elevator" shoes and she asked that they be removed. Once removed, she was more positive of her identification.

Ray Luth. On May 28, 1976, he was an investigator for the Chicago Police Department, investigating the death of Willie King. On May 31, 1976, he and his partner, Officer Kehoe, went to Ms. Morrow's residence and showed her eight photos. She said nothing at that time. Officers Luth and Kehoe returned about an hour later and showed the same eight photos to Ms. Morrow. She went through the photos quickly and picked out defendant's photo. When Luth asked why she did not make an identification after the first viewing, she stated that she was frightened.

On June 1, 1976, Officers Luth and Kehoe spoke to the defendant's aunt, Margaret Hoffman. They asked where defendant could be found and whether any of his clothing was in her apartment. She showed the officers where the clothing was and they took it. They also asked her to contact them if she saw the defendant.

In court, Officer Luth identified the articles of clothing previously shown to Ms. Morrow and Ms. Scott as those he removed from Ms. Hoffman's apartment.

Kenneth Hamilton. He was at his girlfriend's house at about 11:30 a.m. on May 28, 1976. He saw the defendant riding a bike at about 61st and Union, which is one block east of Halsted. He borrowed the bike from defendant and was stopped by police about a minute later. He was placed in a police car and brought to the scene of the crime. There, several people stated he was not the offender.

On cross-examination Hamilton stated the bike had no yellow on it and the only black it might have had was the seat.

At the close of the case, the State offered several exhibits into evidence. The defense objected to the admission of defendant's photograph since it was marked "4 December 1975," the date of an arrest about six months prior to his arrest in this case. The court asked if the State would agree to cut that date portion out, but the State refused. The court reserved ruling on this matter until the close of all the evidence and then decided to let the picture go to the jury with the arrest date on the bottom.

*For the Defense*

Officer James Kehoe. He was assigned to investigate the death of Willie King. He was present on May 29th or 30th when Edna Scott was shown books of photographs, from which she identified a photo of Earl Jackson as the man she saw leaving the record shop.

On cross-examination Officer Kehoe stated that he asked Ms.

Hoffman for Glenn Warmack's clothing. He then identified the hat and pants which he received. In addition, although Ms. Scott had made a positive identification of Earl Jackson, two days later when she viewed a lineup, she identified the defendant as the offender.

Officer Bennett. He was the first officer to arrive at the scene of the shooting. He took descriptions from witnesses, one of whom was Denise Brown, whom he later learned to be Martha Morrow. She told him the assailant had a black bicycle and failed to mention that he wore an earring.

John Gentry. Ms. Hoffman is his mother. Glenn Warmack stayed at his mother's house between five and seven days a week. When shown the articles of clothing recovered from Ms. Hoffman's house, he stated that the suspenders were his, and that his pants, shirt and jacket belonged to Ramon, a co-worker. He had placed the clothes in his mother's basement about two days after the alleged crime. When asked if the clothes would fit defendant, Gentry answered no. In addition, Ms. Hoffman had two sons who were about defendant's age and who also lived at home. Finally, Gentry admitted having two convictions, one for burglary and one for theft. On cross-examination Gentry stated that Ramon, who supposedly owned the pants, shirt and jacket, was about 5'9" tall.

### The State's Rebuttal

The State sought to have the defendant model the articles of clothing arguing that since Gentry had testified that the clothes were not defendant's, the demonstration would be proper impeachment. The court allowed the State's request. Defendant then modeled the pants and jacket before the jury. No questions were asked of defendant during the demonstration. The State also sought to have an Assistant State's Attorney who was about the same height and weight as Ramon demonstrate that the pants and jacket would not fit a person of that size. The court refused the request and the State rested.

The defense counsel asked if he could try the jacket on in front of the jury but the request was denied.

The jury found defendant guilty of the murder of Willie King and of attempt armed robbery. Judgment was entered on both verdicts and defendant appeals.

### Opinion

■■ Defendant first contends that he was not proved guilty beyond a reasonable doubt. The testimony of a single credible witness is sufficient to support a conviction. (*People v. Manion* (1977), 67 Ill. 2d 564, 578, 367 N.E.2d 1313, *cert. denied* (1978), 435 U.S. 937, 55 L. Ed. 2d 533, 98 S. Ct. 1513; *People v. Wade* (1977), 51 Ill. App. 3d 721, 726, 366 N.E.2d 528.) A

review of the record in the instant case indicates sufficient evidence, if believed, to support a conviction. Since we reverse defendant's conviction on other grounds and remand, it is inappropriate to express any further opinion as to guilt.

Defendant contends that the trial court erred in granting the State's motion *in limine* to prevent his impeachment of Ms. Scott with her prior conviction for attempt robbery.[1] She had been convicted on March 7, 1966, and sentenced to 2 1/3 years probation. The trial in the instant case took place in March 1977.

In *People v. Montgomery* (1971), 47 Ill. 2d 510, 268 N.E.2d 695, the Illinois Supreme Court established as a guideline to impeachment by prior conviction Rule 609 as proposed by the Committee on Rules of Practice and Procedure of the Judicial Conference of the United States (Committee version). Subdivision (b) of the proposed rule there provided:

> "(b) Time Limit. Evidence of a conviction under this rule is not admissible if a period of more than 10 years has elapsed since the date of conviction or of the release of the witness from confinement, whichever is the later date." (47 Ill. 2d 510, 516.)

However, subsequently in *People v. Ray* (1973), 54 Ill. 2d 377, 383, 297 N.E.2d 168, the Illinois Supreme Court specifically stated:

> "* * * We consider it clearly important that the use of convictions for impeachment purposes should be governed in future trials by the 10-year limit established in Rule 609(b). That subdivision of the rule provides: 'Time Limit.—Evidence of a conviction under this rule is not admissible if a period of more than 10 years has elapsed since the date of the release of the witness from confinement imposed for his most recent conviction, or the expiration of the period of his parole, probation, or sentence granted or imposed with respect to his most recent conviction, whichever is the later date.' "

The time limit of Rule 609(b) in *Ray* was adopted from the Federal Rules of Evidence as originally approved by the United States Supreme Court on November 20, 1972 (Supreme Court version.)[2]

---

[1] It is unclear from the record whether the conviction was for armed robbery or attempt robbery. We note that in either case a felony conviction was involved.

[2] This version did not become operative since on March 30, 1973, the President signed Public Law 93—12 (28 U.S.C.S. §2071) which provided that the rules as approved by the Supreme Court "shall have no force or effect except to the extent, and with such amendments, as they may be expressly approved by Act of Congress." Thereafter, "An Act to establish Federal Rules of Evidence" was signed into law on January 2, 1975, effective July 1, 1975 (Congressional version), differing in material respects from the Supreme Court version. (See Federal Rules of Evidence, 28 U.S.C. (1976); also Am. Jur. 2d, New Topic Service, Federal Rules of Evidence vii (1975).) Rule 609(b) there provides that the conviction is not admissible if more than 10 years has elapsed since the conviction or release

Under the proposed committee rule in *Montgomery*, Scott's conviction would have been inadmissible since 10 years had elapsed from the date of conviction and she was not confined. However, under the supreme court version of the rule as adopted in *Ray*, the conviction would be admissible because 10 years had not elapsed since the expiration of her period of probation.

■■ We respectfully disagree with the statement in *People v. Yost* (1978), 65 Ill. App. 3d 386, 382 N.E.2d 140, that the time limitation set out in *Montgomery* is to be followed. The court in *Yost* reasoned:

> "*Ray* extended the 10-year period pertaining to conviction or release from confinement to the expiration of a witness's period of probation or parole. We acknowledge that in the case of *Ray* our supreme court did apparently rely upon a proposed Federal draft which antedated the *Montgomery* draft and which brought into consideration the factors of parole and probation. We deem this to be an inadvertent mistake in the case of *Ray*, since the supreme court reiterated that *Montgomery* set forth the law to be followed in Illinois regarding prior convictions." (65 Ill. App. 3d 386, 390.)

The "proposed Federal draft which antedated the *Montgomery* draft" referred to in *Yost* is in fact the Supreme Court version and postdated the 1971 *Montgomery* decision. The version described and quoted in *Yost* as being the rule as adopted by the United States Supreme Court is actually Rule 609(b) as enacted by Congress. A comparison of (1) the proposed committee rule, (2) the Supreme Court version, and (3) the Congressional enactment convinces us that the time limit in *Ray* was not an "inadvertent mistake." *Ray* clearly considered only the proposed committee rule and the Supreme Court version in stating, "* * * Rule 609, in its proposed form when we considered *Montgomery*, then provided the trial judge with discretionary powers * * *" and "However, this contemplated discretionary authority in proposed Rule 609(a)(3) was eliminated when the rule was adopted." (54 Ill. 2d 377, 382, 383.) Neither the Congressional version, which had not then been enacted into law, nor any of its provisions was mentioned. The court in *Ray* stated, "We consider it clearly important that the use of convictions for impeachment purposes should be governed in future trials by the 10-year limit established in Rule 609(b)." (54 Ill. 2d 377, 383.) The court then set forth the Supreme Court version verbatim. *Ray* clearly expands the 10-year

of the witness from the confinement imposed for that conviction, whichever is later, unless the court determines the probative value substantially outweighs its prejudicial effect after advance notice of its intended use by proponent and a fair opportunity to the adverse party to contest its use.

period to include the factors of parole and probation. The trial court, as well as this court, is bound to follow Ray, and accordingly, Edna Scott's prior conviction was within the time limit of Rule 609(b) and subject matter for impeachment.

The trial court still retains discretion on whether or not to allow impeachment by a prior conviction. (*People v. Ray.*) The test to be applied is whether "the probative value of the evidence of the crime is substantially outweighed by the danger of unfair prejudice." (*People v. Montgomery* (1971), 47 Ill. 2d 510, 516.) The State asserts that the trial court properly exercised this discretion and barred impeachment by the conviction. However, it appears from the record of the motion *in limine* that no balancing of probative value against prejudice occurred. After first stating the 10-year time limit as set forth in *Montgomery* and proposed Rule 609(b), and then the balancing test, the assistant state's attorney stated:

"The robbery conviction is clearly outside the scope of Montgomery."

At this point, the following exchange took place:

"MR. WEXLER [Defense attorney]: Even reading Hunter's the way Mr. Schlesinger suggested, he said that the later date, whether the date of conviction or release, and the release was less than ten years.

Secondly—

MR. HARRIS [Assistant State's Attorney]: She was on probation during that time.

MR. SCHLESINGER [Assistant State's Attorney]: It says release from confinement, Judge."

The trial court then sustained the State's motion to preclude impeachment. No discussion of probative value and prejudice took place. It appears that the trial court did not exercise its discretion because it considered the prior conviction outside the 10-year period and therefore not subject matter for impeachment. Furthermore, the conviction in the instant case could properly be used for impeachment and we see no reason to hold otherwise.

■■ Applying the discretionary test of *Montgomery* to the facts of the instant case, we find that the probative value is not substantially outweighed by any prejudice to the witness. The testimony of Ms. Scott was of great significance in this case since she was one of two eyewitnesses to the crime. The other eyewitness by her own admission only saw the assailant for a total of 2-3 seconds. The identification testimony of Ms. Scott would be a major part of the State's evidence. She had earlier identified a photograph of Earl Johnson as that of the killer. In

view of the importance of Ms. Scott's identification and her prior mis-identification, any additional impeachment probative of her credibility would be material.

The danger of unfair prejudice in the present case is minimal. The witness here is not a defendant on trial. Accordingly, there is no fear that the prior crime would be used to convict Ms. Scott. Rather, only her credibility would be questioned. At most, the introduction of the prior conviction would cause momentary embarrassment to the witness, and would not cause unfair prejudice.

On these facts, the probative value of the introduction of Ms. Scott's prior conviction could not be outweighed by any prejudice. As noted earlier, it appears that no such balancing took place at trial because of the misapplication of Rule 609(b). The decision to exclude evidence of Ms. Scott's prior conviction was error. *People v. Jacobs* (1977), 51 Ill. App. 3d 455, 366 N.E.2d 1064; *People v. Thomas* (1978), 58 Ill. App. 3d 402, 374 N.E.2d 743.

The State asserts that defendant waived any objection on this issue because he did not argue that the prior conviction fell within the 10-year period. The record does show that defendant argued that release was within the time limit, but that the assistant state's attorney stated the more restrictive *Montgomery* rule rather than the applicable *Ray* period. Later, the defense attorney objected to the granting of the motion *in limine*, and included this issue in his written motion for a new trial. We find that defendant has adequately preserved this contention for appeal.

The State also argues that any error in this regard could only be harmless. However, as already noted Ms. Scott was one of two eye-witnesses and the identification of each was material. On this record we are unable to say that the error was harmless beyond a reasonable doubt. We therefore reverse defendant's conviction for murder and remand for a new trial.

■■ It must be recognized that in the instant case, more than 10 years have now elapsed since the expiration of the probation term imposed on Ms. Scott in 1966. Strict application of *Ray* at a new trial would bar the use of that conviction. It is our duty to assure that no advantage is taken of the error and that the parties be reinstated to all rights as if the error had not occurred. (See *Follansbee v. Scottish-American Mortgage Co.* (1880), 7 Ill. App. 486, 498.) The error is to be remedied by a new trial consistent with the traditional concepts of due process. (See *People v. Nelson* (1960), 18 Ill. 2d 313, 164 N.E.2d 16.) Defendant at the former trial was erroneously deprived of the right to use such conviction for impeachment purposes. Accordingly, in the interest and furtherance of fairness and justice, if the prosecution presents the testimony of Ms. Scott on remand, the 1966 conviction shall be admissible for impeachment purposes, notwithstanding the time then elapsed.

In view of the reversal of defendant's conviction, we find it necessary to comment only briefly on those matters likely to recur on retrial.

Defendant contends that the prosecutor's comments in opening argument concerning the clothes belonging to defendant constituted reversible error, since no proof of ownership was put forth at trial. Officer Luth testified that he recovered the clothing from defendant's aunt, but was unable to testify as to the aunt's hearsay responses to his questions regarding the clothing. There was never any specific proof offered at trial that the clothes belonged to defendant. It is improper for a prosecutor to comment on what testimony will be introduced at trial and then fail to produce that evidence. (*People v. Rogers* (1976), 42 Ill. App. 3d 499, 356 N.E.2d 413.) Although ownership of the clothing could be inferred from the evidence as brought forth at trial, the prosecutor should not have asserted defendant's ownership in his opening statement in the absence of specific proof at trial. We trust that such comments will be avoided on retrial.

In his reply brief, defendant also contends that the examination of Officer Luth was an indirect method of admitting the hearsay evidence of defendant's aunt, and relies on *People v. Spivey* (1978), 58 Ill. App. 3d 677, 374 N.E.2d 1068. The State made a motion to strike defendant's reply brief or in the alternative to strike this particular argument for failure to comply with Supreme Court Rule 341(g). (Ill. Rev. Stat. 1977, ch. 110A, par. 341(g).) That rule provides:

> "(g) The reply brief, if any, shall be confined strictly to replying to arguments presented in the brief of the appellee and need contain only Argument."

Since neither party raised this issue in their original briefs, it cannot be raised for the first time in defendant's reply brief. (Ill. Rev. Stat. 1977, ch. 110A, par. 341(g).) Accordingly, the issue is not considered.

Defendant contends that it was reversible error to require defendant to wear the clothes identified as those worn by the assailant before the jury. He contends that he never testified or denied that the clothing might fit him and that the demonstration was of no probative value and could only mislead the jury. The State relies on *People v. Tomaszek* (1964), 54 Ill. App. 2d 254, 204 N.E.2d 30, *cert. denied* (1965), 382 U.S. 827, 15 L. Ed. 2d 72, 86 S. Ct. 62, to justify requiring defendant to try on the clothes. In that case, defendant, testifying in his own behalf, denied ownership of certain eyeglasses. On cross-examination at the request of the state's attorney, and over objection, defendant put on the glasses and was questioned on his ability to use them. The court held that this demonstration did not violate defendant's privilege against self-incrimination. The State contends that regardless of whether defendant testified at trial, the modeling of the clothes did not violate defendant's

Fifth Amendment privilege against self-incrimination as applied to the States through the Fourteenth Amendment. *Malloy v. Hogan* (1964), 378 U.S. 1, 12 L. Ed. 2d 653, 84 S. Ct. 1489.

The scope of the privilege against self-incrimination was examined in *Schmerber v. California* (1966), 384 U.S. 757, 763-64, 16 L. Ed. 2d 908, 915-16, 86 S. Ct. 1826, 1831-32, as follows:

" * * * The leading case in this Court is Holt v. United States, 218 US 245, 54 L. Ed. 1021, 31 S. Ct. 2. There the question was whether evidence was admissible that the accused, prior to trial and over his protest, put on a blouse that fitted him. It was contended that compelling the accused to submit to the demand that he model the blouse violated the privilege. Mr. Justice Holmes, speaking for the Court, rejected the argument as 'based upon an extravagant extension of the Fifth Amendment,' and went on to say: '[T]he prohibition of compelling a man in a criminal court to be witness against himself is a prohibition of the use of physical or moral compulsion to extort communications from him, not an exclusion of his body as evidence when it may be material. The objection in principle would forbid a jury to look at a prisoner and compare his features with a photograph in proof.' 218 US, at 252-253, 54 L. ed. at 1030.

It is clear that the protection of the privilege reaches an accused's communications, whatever form they might take, and the compulsion of responses which are also communications, for example, compliance with a subpoena to produce one's papers. [Citation.] On the other hand, both federal and state courts have usually held that it offers no protection against compulsion to submit to fingerprinting, photographing, or measurements, to write or speak for identification, to appear in court, to stand, to assume a stance, to walk, or to make a particular gesture. The distinction which has emerged, often expressed in different ways, is that the privilege is a bar against compelling 'communications' or 'testimony,' but that compulsion which makes a suspect or accused the source of 'real or physical evidence' does not violate it."

Although not specifically adopted by the Supreme Court in *Schmerber*, the observations of Dean Wigmore are instructive:

" * * * From the general principle (§2263 *supra*) it results that an inspection of the bodily features by the tribunal or by witnesses does not violate the privilege because it does not call upon the accused as a witness—i.e., upon his testimonial responsibility. That he may in such cases be required sometimes to exercise muscular action—as when he is required to take off his shoes or roll up his sleeve—is immaterial, unless all bodily action were synonymous

with testimonial utterance; for, as already observed (§2263 *supra*), not compulsion alone is the component idea of the privilege, but testimonial compulsion. What is obtained from the accused by such action is not testimony about his body, but his body itself (§1150 *supra*.) Unless some attempt is made to secure a communication—written, oral or otherwise—upon which reliance is to be placed as involving his consciousness of the facts and the operations of his mind in expressing it, the demand made upon him is not a testimonial one. Moreover, a practical consideration applies to this class of evidence. When the person's body, its marks and traits, itself is in issue, there is ordinarily no other or better evidence available for the prosecutor." 8 Wigmore, Evidence §2265, at 386 (McNaughton rev. 1961).

■■ In the present case, the exhibition of the defendant in the clothing did not violate his privilege against self-incrimination. Defendant was merely required to allow the jury to view his body dressed in specific articles of clothing so that it could determine whether they fit him. Since no evidence of a testimonial nature was elicited from defendant, the exhibition did not violate his privilege against self-incrimination.[3] Since this compelled exhibition is not prohibited by the Fifth or Fourteenth Amendments, it is immaterial that defendant did not testify in his own behalf and thereby waive his privilege against self-incrimination.

Defendant argues that whether the clothing fit him was not probative of any issue and could only mislead the jury into concluding that if they fit him, he must be the killer. The fit would be of some probative value as to possible ownership of the clothes and to rebut Gentry's claim that they would not fit defendant and that they in fact belonged to Ramon. Although if the clothes fit, defendant would only be included in a group of people who could wear the clothes, this would be of some probative value to a jury. It is within the jury's province and duty to give weight to this evidence. Both sides argued this point in their closing arguments, and it cannot be said that the evidence would mislead a jury.

■■ Defendant's final contention is that it was reversible error for the defendant's "mug shot" to be seen by the jury. Although the photograph of defendant indicated only the date of a prior arrest and did not bear the legend of any police department, it is still possible that a jury would infer that the photograph was the result of a prior arrest. We need not decide whether the introduction of the photograph as submitted was so prejudicial as to require a new trial. (*People v. Hawkins* (1972), 4 Ill. App.

---

[3] For further support of this position see: McCormick, Evidence §124, at 264-66 (2d ed. 1972); Annot., 171 A.L.R. 1144 (1947); *State v. Trueman* (1975), 303 Minn. 426, 227 N.W.2d 824; *State v. Williams* (1976), 307 Minn. 191, 239 N.W.2d 222.

3d 471, 281 N.E.2d 72; *People v. West* (1977), 51 Ill. App. 3d 29, 366 N.E.2d 1043.) However, to avoid any possible prejudice to defendant, the procedure of deleting the date employed in *People v. Hayes* (1973), 14 Ill. App. 3d 248, 302 N.E.2d 411, is preferable and should be followed on retrial.

Accordingly, defendant's convictions for murder and attempt robbery are reversed and the cause remanded for a new trial in accord with the views expressed herein.

Reversed and remanded.

LORENZ and WILSON, JJ., concur.