FIRST DIVISION

December 8, 1997

Nos. 1-95-3829 & 1-96-0386; Cons.

THE PEOPLE OF THE STATE OF ILLINOIS,

Plaintiff-Appellee,

v.

ANTILLIO WATKINS,

Defendant-Appellant.

)

)

)

)

)

)

)

)

)

Appeal from the

Circuit Court of

Cook County

Honorable

William J. Hibbler,

Judge Presiding.

JUSTICE GALLAGHER delivered the opinion of the court:

On August 29, 1992, a jury convicted the defendant, Antillio Watkins, of two counts of first degree murder for the shooting deaths of Dovette Russell and Vastille Blakely.  That jury also convicted defendant of the attempted murder of Michael Jones.  The State requested a death penalty hearing, and defendant waived his right to have that hearing conducted before a jury.  Ill. Rev. Stat. 1991, ch. 38, par. 9-1 (West 1991)(now 720 ILCS 5/9-1 (West 1996)).  On September 24, 1992, the trial court found defendant eligible for the death penalty and sentenced him to death by lethal injection for the murders of Russell and Blakely; the court also imposed a 30-year sentence for the attempted first degree murder of Michael Jones.  The Illinois Supreme Court subsequently remanded the case to the trial court, ordering it to entertain a postsentencing motion, which is required to preserve sentencing issues for review in capital cases.  
People v. Szabo
, 113 Ill. 2d 83, 93, 497 N.E.2d 995, 999 (1986).  Defendant's trial counsel had failed to file any such motion.  On September 20, 1995, after a hearing on the postsentencing motion, the trial court vacated defendant's death sentence, imposing instead a sentence of natural life imprisonment for defendant's murder convictions.  On September 22, 1995, defendant filed a 
pro
 
se
 postconviction petition and motion for appointment of counsel; that petition was dismissed as frivolous without the appointment of counsel.

Defendant now appeals from his murder and attempted murder convictions, and from the summary dismissal of his postconviction petition.

The State's primary witness was Michael Jones.  He testified that on October 13, 1990, he borrowed a yellow Cadillac from his friend, Dovette Russell.  Russell gave Jones her pager so that she might contact him if she needed her car.  At around 10 or 11 o'clock that night, Russell paged Jones and asked him to pick up her friend, Tip.  Michael Jones then made an in-court identification of defendant as the man he knew as Tip.  Jones had met defendant roughly one week prior to the night of the shooting.  After Jones picked defendant up outside a bar, defendant instructed Jones how to get to an apartment located at 1063 West Glenlake on the north side of Chicago.  The drive took approximately 25 minutes.  Jones then accompanied defendant into a first-floor apartment at 1063 West Glenlake, in which Dovette Russell and Vastille Blakely were waiting.  Jones went into the apartment to use the bathroom and to get gas money from Dovette for picking up her friend, meaning defendant.  On his way to the bathroom, Jones heard Russell tell defendant that she wanted him to act as her bodyguard as she "took care of something."  Jones said that, by this time, it was past midnight.

Once Jones returned from the bathroom, defendant said, "look, you all just get on the bed."  Jones did not think defendant was serious, until he felt a shot, like a "sledge hammer," hit him in the jaw.  As he was shot, Jones briefly saw a gun out of the corner of his eye.  Defendant was holding what looked like a small, automatic weapon.  Jones then saw Vastille and Dovette jump upon the bed and heard them begging for their lives, saying "please, no, don't," to defendant as he reached toward them with the gun in his hand.  Jones saw defendant point the gun at Dovette's head and then Vastille's chest before Jones passed out.  When he came to, Jones noticed that the screaming had stopped, but he did hear defendant walking toward him.  Jones pretended to be dead.  Defendant took the car keys out of Jones' hand and left.  

After waiting a few minutes to be sure defendant had gone, Jones dialed 911.  He saw the bodies of Dovette Russell and Vastille Blakely.  Jones met the police outside the apartment and described his assailant as a black male, 5 feet 10 inches tall and approximately 200 pounds, with a goatee mustache and a nose ring.  He also stated that the shooter wore a black and white jogging suit and a dark felt hat.  Paramedics then took Jones to Illinois Masonic Hospital, where he underwent surgery and had his jaw wired shut.  After about a day and a half, police visited Jones at the hospital.  Jones identified defendant through two separate photographic lineups.

On cross-examination, Jones stated that he never gave the name of his assailant to the 911 telephone operator.  He simply repeated, "please help me, hurry.  Help me."

Linda Moy testified for the prosecution as well.  Dovette Russell was Moy's friend, and whenever she needed to contact Dovette, she would page her.  The prosecutor then showed Ms. Moy a pager, which Moy identified as Dovette Russell's pager.  Ms. Moy stated that the last time she had seen that pager was in Dovette Russell's possession on October 11, 1990.  

Deborah Bugaj-Moeller, a paramedic with the Chicago fire department, testified that she and a partner responded to a call at 1063 West Glenlake at 3 a.m. on October 14, 1990.  Upon their arrival, Bugaj-Moeller saw Michael Jones lying in the courtyard of the building with a gunshot wound to his jaw.  Jones repeatedly mumbled "Tip" or "Trip" as the paramedics treated him and took him to Illinois Masonic Hospital.

The results of the autopsies indicated that both Dovette Russell and Vastille Blakely died from gunshot wounds.  When the police found their bodies, each victim's clothing was in disarray.  A search of the crime scene revealed three fired bullets, four cartridges and several unfired bullets; all of the recovered ammunition fit a 9 millimeter, automatic handgun.  A sizeable amount of narcotics was hidden behind the headboard of the bed, although no money was found.

The State also called Anthony Demus, defendant's next-door neighbor.  He testified that on October 14, 1990, defendant spoke with him on Demus' back porch.  This occurred at roughly 4:00 a.m.  Defendant informed Demus that Dovette was dead.  Defendant next stated that "the Colombians" had killed her.  Finally, defendant admitted to Demus that defendant himself had killed Dovette; however, in Demus' opinion, defendant made this admission in jest.

Detective Joseph Guzolek of the Chicago police department testified that he had been assigned to investigate the homicides of Dovette Russell and Vastille Blakely.  Guzolek first attempted to interview Michael Jones at the hospital on October 14, 1990; however, this attempt proved unsuccessful as Jones was sedated and sleeping.  Using the nickname "Tip" (obtained, presumably, from information provided by the paramedics), Guzolek discovered the proper name of Antillio Watkins, residing at 6826 South Cornell in Chicago, in a nickname file compiled by the Chicago police.  He retrieved a 1988 "mug shot" photo of defendant, along with three other photos, and again went to Illinois Masonic Hospital to attempt to interview Michael Jones.  This time, Jones was awake.  Jones identified defendant as his assailant from the four photos presented by Guzolek.  Jones could not speak but wrote out "looked like" on a piece of paper, indicating toward defendant's photograph.  When Guzolek asked the victim the name of his attacker, Jones wrote out "TIP."  This identification occurred at roughly 12:35 a.m. on October 15, 1990.  Guzolek next proceeded to 6826 South Cornell, where he awaited the defendant.  Defendant, however, could not be found at that address.  Guzolek remained until approximately 6 a.m., at which time he returned to the police station to write his reports and be relieved.

Chicago police detective Paul Hagen took over the investigation from Detective Guzolek at 10:45 a.m. on October 15, 1990.  Hagen and his partner proceeded directly to 6826 South Cornell.  Defendant's brother admitted the police to the apartment, where they found defendant asleep in bed.  Hagen woke defendant and placed him under arrest.  Searching defendant's bedroom, the police found numerous articles of brand new clothing, approximately $180 in cash, and a pager resting upon the pile of cash.  Defendant pointed to the pile and informed the police that he wanted to bring "that" with him.  The police complied, and they confiscated both the cash and the pager.  Defendant stated that the pager belonged to him.  Later, the police returned and seized the clothing they observed in the bedroom, as well as a black felt hat.  Once they returned to the station, the police took a Polaroid photograph of defendant.  That photo and several others were shown to Michael Jones at Illinois Masonic Hospital.  Upon seeing the more recent photo of defendant, Jones immediately identified defendant as the man who shot him.

Later that day, Hagen spoke with Linda Moy.  Moy informed the detectives about the victim's pager and gave them the number.  The police dialed that number, which activated the pager seized from defendant's bedroom.  The State then rested its case in chief.

In its case in chief, the defense called Renee White.  She testified that she and defendant were friends and coworkers at Sweet Georgia Brown's lounge.  At about 8:30 p.m. on October 13, 1990, White went to the Sophisticated Touch Lounge on Chicago's south side, where she saw defendant.  She and defendant remained at Sophisticated Touch until 2 a.m., when they left to go to Sweet Georgia Brown's.  Once there, she and defendant met another friend, Vivian Finley, who was working in the kitchen.  The three sat and talked until 4:30 a.m., at which point they all went to Ms. Finley's house.

Vivian Finley also testified for the defense.  Her account of the events of October 13-14, 1990, essentially corroborated the testimony of Ms. White.  Finley stated that after she, defendant, and Ms. White arrived at her house in the early morning hours of October 14, the three played records until roughly 11 o'clock the next morning.  Defendant then left.  On cross-examination, Finley testified that she discovered defendant had been arrested the following day when the police telephoned her home.  She further stated that defendant was still in her home when the police called to inform her that they had arrested him.

Finally, the parties stipulated that Officer Lorraine Taylor, if called to testify, would state that she worked as an emergency dispatcher on October 14, 1990, and that she received a 911 call at 2:56 a.m. that morning.  The caller identified himself as Michael.  The parties further stipulated that the audiotape offered by the defense was an accurate recording of that call.  Defense counsel next played the audiotape for the jurors.  The defense then rested.

On rebuttal, the State called Brian Townsend.  Townsend stated that Michael Jones was his cousin, and that Jones dropped him off at Sweet Georgia Brown's at 11 p.m. on October 13, 1990.  Jones was then driving Russell's yellow Cadillac.  Townsend also knew defendant as Tip, having met him at Sweet Georgia Brown's several months earlier.  On the evening of the crime, Townsend waited for Jones at Sweet Georgia Brown's until 3:30 a.m. on October 14, 1990.  After Jones failed to show, Townsend took a cab home.  Townsend never saw defendant at Sweet Georgia Brown's that evening.

Detective Hagen also testified on rebuttal.  He stated that after advising defendant of his constitutional rights, he spoke with defendant at the police station on October 15, 1990.  Hagen testified that defendant never said he was at Sweet Georgia Brown's on the night of October 13-14, 1990.  Defendant never stated he spent the evening with Renee White or Vivian Finley.  Instead, defendant claimed that he and Mr. Rodney Casey had been at the Sophisticated Touch Lounge from 12 a.m. to 3 a.m.  Hagen stated that he never located Casey.  The State then rested.  The jury found defendant guilty of the first degree murders of Dovette Russell and Vastille Blakely, and of the attempted murder of Michael Jones.

On appeal, defendant asserts the following arguments: (1) he was denied the effective assistance of counsel when his trial attorney failed to file a motion to suppress Dovette Russell's pager, which was recovered by the police when they arrested defendant; (2) he was deprived of a fair trial where the prosecution injected evidence of prior crimes by introducing a two-year-old "mug shot" and referring to the fact that defendant was listed in a police "nickname file";  alternatively, defendant argues that his trial counsel was ineffective for failing to object to the introduction of such evidence; and (3) he was deprived of a fair trial when the trial court admonished the jurors to reconsider their positions in order to reach a unanimous verdict, after the trial court knew that the numerical division of the jury stood at 10 to 2 in favor of conviction.  We affirm.

Defendant first contends that he was denied the effective assistance of counsel when his trial attorney failed to file a motion to suppress the pager of Dovette Russell.  In order to successfully establish the ineffective assistance of counsel, a defendant must show (1) that the performance of counsel fell outside the range of professionally competent assistance, and (2) that the deficient performance prejudiced the defense.  
Strickland v. Washington
, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984).  Defendant suggests that such a motion had "obvious merit," compelling the conclusion that trial counsel's failure to seek exclusion of the pager fell outside the range of professionally competent assistance.  Even assuming, 
arguendo
, that the conduct of defendant's trial counsel did fall outside the range of professionally competent assistance, we hold that counsel's alleged omission did not result in prejudice to the defendant.

Defendant charges that the police seized the pager in violation of his fourth amendment right to be free from unreasonable searches and seizures.  In our view, however, the plain view doctrine applied to authorize seizure of the pager; therefore, any attempt to exclude it would not have succeeded and so defendant did not suffer prejudice from trial counsel's failure to file a motion to suppress.  The plain view doctrine authorizes the warrantless seizure of an item when the following requirements are satisfied: (1) the police view the object from a place where they are legally entitled to be; and (2) it must be immediately apparent to the police that the items may be evidence of a crime, contraband, or otherwise subject to seizure.  
Horton v. California
, 496 U.S. 128, 110 L. Ed. 2d 112, 110 S. Ct. 2301 (1990).  The requirement that an item's criminal nature be "immediately apparent" essentially translates into a probable cause requirement.  
Texas v. Brown
, 460 U.S. 730, 738, 75 L. Ed. 2d 502, 511, 103 S. Ct. 1535, 1541 (1983)("[t]he seizure of property in plain view *** is presumptively reasonable, assuming that there is probable cause to associate the property with criminal activity"); 
Arizona v. Hicks
, 480 U.S. 321, 326, 94 L. Ed. 2d 347, 355, 107 S. Ct. 1149, 1153 (1987); 
People v. Bibbs
, 176 Ill. App. 3d 521, 523, 531 N.E.2d 75, 76 (1988).  

In the present case, defendant concedes that Detective Hagen had probable cause to arrest defendant after Michael Jones identified him as his assailant.  Defendant further concedes that the arrest occurred in defendant's bedroom because the police lawfully gained entrance to the premises after defendant's brother permitted them to enter.  Finally, defendant acknowledges that the police then conducted a lawful search incident to arrest.  Pursuant to their search, the police discovered the pager lying atop a pile of money.  However, defendant now asserts that the police did not have probable cause to seize the pager and, therefore, that the plain view doctrine does not apply in this case.

It is common knowledge--even to the layperson--that pagers and other forms of communications technology are widely used in the distribution of narcotics.  The evidence at trial indicated that the police discovered a sizeable quantity of narcotics at the crime scene.  Under the circumstances in which the beeper was discovered--lying atop a "pile" of money--we believe that these facts, available to both Detective Hagen and his partner, warranted a reasonable belief in their minds that the pager may have been useful as evidence linking defendant to the crime.  
Texas v. Brown
, 460 U.S. at 742, 75 L. Ed. 2d at 514, 103 S. Ct. at 1543.  Accordingly, we hold that the plain view doctrine applied to justify the seizure of the pager.  As a result, any motion to suppress filed by defendant's trial counsel would have been unsuccessful, and the failure to file such a motion could not have prejudiced defendant.  We therefore reject defendant's first point of error.  

In addition, because of our holding that the pager was admissible under the plain view doctrine, we affirm the summary dismissal of defendant's postconviction petition.  Since the plain view doctrine authorized seizing the pager, defendant's postconviction petition failed to present the gist of a meritorious constitutional claim, thus making summary dismissal appropriate.  
People v. Brown
, 169 Ill. 2d 94, 101, 660 N.E.2d 964, 967 (1995).

Defendant next argues that he was deprived of a fair trial, insofar as the prosecution placed before the jury impermissible prior crimes evidence by introducing defendant's two-year-old mug shot photo and by mentioning the fact that defendant was listed in a police "nickname file."  As defendant correctly points out, evidence of other crimes in which the defendant may have participated is not admissible to show the defendant's propensity for criminal activity.  
People v. Coleman
, 158 Ill. 2d 319, 333, 633 N.E.2d 654, 662 (1994).  The State responds, however, that defendant waived this argument by failing to object to the issue at trial or raise the issue in his posttrial motion.  
Coleman
, 158 Ill. 2d at 333, 633 N.E.2d at 662.  Nevertheless, Supreme Court Rule 615(a) permits review of issues not properly preserved at trial under the plain error doctrine, where (1) the evidence is closely balanced, or (2) the error is of such magnitude that defendant was denied a fair trial.  
Coleman
, 158 Ill. 2d at 333, 633 N.E.2d at 662.  Because improper use of prior crimes evidence may have denied defendant a fair trial (
People v. Graham
, 179 Ill. App. 3d 496, 509, 534 N.E.2d 1382, 1390 (1989)), we review this issue under the second prong of the plain error doctrine.  
Coleman
, 158 Ill. 2d at 334, 633 N.E.2d at 662.

We first consider the admission of defendant's two-year-old mug shot photo.  Evidence of other crimes is admissible if it is relevant for any 
legitimate
 trial purpose, such as identification, 
modus
 
operandi
, proof of motive, intent or absence of mistake.  
Coleman
, 158 Ill. 2d at 333, 633 N.E.2d at 662.  The State argues that it introduced the mug shot photo at trial for the legitimate purpose of establishing that Michael Jones, the only surviving victim, initially identified the defendant through said photo.  Defendant responds by saying that identification was never an issue in the trial.  The record, however, belies defendant's response, because in his opening statement defense counsel stated, "This is a case of pure mistaken identity."  As such, we find no error in the admission of the mug shot photo.  See 
People v. Davis
, 285 Ill. App. 3d 1039, 1045, 675 N.E.2d 194, 200 (1996)(trial court did not abuse its discretion where it admitted a mug shot photo but did not alter the photo to remove any and all information of the prior arrest).

Defendant also complains that the State's reference to a police "nickname file," located at Chicago Police Area One Violent Crimes headquarters, gratuitously colored defendant as a person with a violent criminal history.  Assuming that this offhand reference constituted error, we find such error to be harmless due to the overwhelming evidence of guilt in this case.  The jury heard eyewitness testimony from the surviving victim identifying defendant as the man who shot him; one of the victim's personal belongings (namely, the pager) was found in defendant's possession; another State witness testified that defendant had confessed to the crime one hour after it occurred; finally, on rebuttal the State offered evidence strongly undermining the credibility of defendant's alibi witnesses.  See generally 
People v. Carroll
, 260 Ill. App. 3d 319, 344, 631 N.E.2d 1155, 1171 (1992), quoting 
People v. Warmack
, 83 Ill. 2d 112, 128-29, 413 N.E.2d 1254, 1262 (1980)("'In reviewing what we believe to be the abundant evidence of guilt, however, we have concluded that the error is harmless.  We have considered the totality of the evidence presented and can safely conclude that a trial without this error would produce no different result'"), 
rev'g
 73 Ill.App.3d 783, 392 N.E.2d 334 (1979).  Because any error in referring to the "nickname file" was harmless, we reject defendant's second point of error. 

Given our conclusion that no reversible error occurred in the admission of evidence pertaining to defendant's prior criminal history, we need not discuss defendant's ineffective assistance argument with respect to trial counsel's failure to object to such evidence.  Plainly, that contention lacks merit.

Finally, defendant contends he was deprived of a fair trial when the trial court admonished the jurors to reconsider their positions in order to reach a unanimous verdict, where the trial court knew that the numerical division of the jury stood at 10 to 2 in favor of conviction.  Before we consider this argument, we find it necessary to recount the events that occurred during the jury's deliberations.

On August 28, 1992, at 1:20 p.m., the court instructed the jury and it retired to deliberate.  At 7 p.m., the court reconvened and announced to the parties that it had received two notes from the jury.  The two notes, marked "5:45 p.m." and "6:30 p.m.," respectively, both indicated a 10 to 2 split amongst the jurors--the majority favoring conviction.  The court informed the parties that the notes reflected the jurors' opinion that they were deadlocked.  After discussing the matter with both sides (although it did not disclose to the parties the numerical division of the jurors), the court announced its intention to issue an anti-deadlock instruction.  Neither party objected to the proposed course of action.  

Immediately thereafter, the court recalled the jurors and informed them that, in their communications with the court, they need not reveal the division of the jurors and how many favored conviction over acquittal.  Without objection, the court next admonished the jury as follows:

"[I]t is important that we try in every case [to]
 arrive at a unanimous verdict.  This case has been tried and you have been privy to all the evidence in the case.  It is not likely that that evidence will ever change.  It is the court's belief that it should be possible for 12 reasonable people to arrive at a unanimous verdict if you diligently deliberate.  

I know you have been deliberating for [some time].  I believe you went out at 1:25[p.m.]  And you have had lunch and dinner since you have been out.  But despite that fact, it is still about six hours.

I'm going to request and require that you return to the jury room and continue your deliberations.  Now, I know you have been at it for [some time] here this afternoon and as the hour grows later your ability to concentrate and to deliberate might be somehow impaired.  I will allow you to deliberate for [some time] longer this evening and at some later hour if you have not arrived at a unanimous verdict I will make a determination as to whether or not accommodation will be provided for you for the evening so that you can get a fresh start tomorrow.

But at this time I ask that you return to the jury room, continue your deliberations.  I would indicate to each of you that you should not be constrained not to reconsider your position, not to rediscuss the evidence with a new view hopefully to arrive at a unanimous verdict without doing violence to any of your individual consciences.  With that, will you please retire to the jury room and continue your deliberations."

The jury was then excused to continue its deliberations.

At approximately 8:30 p.m., the court reconvened again to inform the parties that it had received yet another note from the jury.  This note stated, "Tempers are flairing [
sic
].  I feel no decision will be reached tonight.  We request, we begin to deliberate in the morning [
sic
]."  The court then announced that it planned to suspend deliberations and sequester the jury until the following morning.  Before the suspension of deliberations, however, one juror requested the court to repeat its earlier admonition.  The following colloquy ensued:

"THE COURT:  My question then is should I read the Prim Instruction [(
People v. Prim
, 53 Ill. 2d 62, 289 N.E.2d 601 (1972))] and add those comments that I added before or should I just tell them what I told them before about re-examining their position, attempting to arrive at a unanimous verdict, et cetera?

MR. GORDON [defense attorney]:  And my position on behalf of Mr. Antillio Watkins would be just to rather than give them the Prim Instruction, just repeat or reiterate what you had already told them.

THE COURT:  State.

MR. ANDREWS [Assistant State's Attorney]:  Judge, I agree with Mr. Gordon, Judge."

Subsequently, the trial court called the jurors before him and stated: 

"[Y]ou have heard all the evidence in the case.  You have been privy to arguments of counsel and the law.  It is not my belief that to retry this case would substantially change that evidence.  And hopefully, the 12 reasonable people that you are, it appears that you should be able to arrive at a unanimous verdict.  If each of you understand that you are not a partisan in this case.  That all should review the evidence, that you should be willing to reconsider your own point.  That you should listen to the opinions of others and re-examine your own opinions and your own determinations as to what the facts are.  Keeping in mind that you must do that with an eye towards not doing violence to your own judgment.  But that you should do that with an eye of trying to arrive at a unanimous verdict.  Because it is in the interest of justice for all parties that we be able to arrive at a unanimous verdict after hearing all the evidence."

The jury was then sequestered.  At roughly 9 a.m. the following day, the jury resumed its deliberations.  That same day at noon, August 29, 1992, the jury returned verdicts finding defendant guilty of the first degree murders of Dovette Russell and Vastille Blakely, and the attempted murder of Michael Jones.

As defendant correctly points out, it may be improper for a court to issue supplemental instructions urging deadlocked jurors to reach a unanimous verdict after the court becomes aware that a majority of jurors favor conviction.  
People v. Santiago
, 108 Ill. App. 3d 787, 805, 439 N.E.2d 984, 996 (1982).  This rule of law arises from the possibility that a supplemental jury instruction given to a deadlocked jury may have a coercive effect upon jurors in the minority, particularly where those jurors might feel that the judge agrees with the majority.  
People v. Prim
, 53 Ill. 2d 62, 72-73, 289 N.E.2d 601, 607-08 (1972); 
People v. Danielly
, 274 Ill. App. 3d 358, 366, 653 N.E.2d 866, 872 (1995).  However, where the trial court receives an 
unsolicited
 statement regarding the numerical division of the jurors, an order instructing the jury to continue its deliberations does not constitute error.  
People v. Iozzo
, 195 Ill. App. 3d 1078, 1086, 552 N.E.2d 1308, 1314 (1990); 
People v. Farella
, 79 Ill. App. 3d 440, 445, 398 N.E.2d 615, 619 (1979).  We hold that the trial court's anti-deadlock admonition, given after the jury volunteered its numerical breakdown of 10 to 2 in favor of conviction, does not rise to the level of reversible error.

Defendant argues that 
Farella
 stands for the proposition that the trial court should have merely instructed the jurors to keep deliberating.  While it is true that the court in that case did not admonish the jurors as to the need for unanimity (
Farella
, 79 Ill. App. 3d at 445, 398 N.E.2d at 619), it does not follow that the supplemental instruction issued by the trial court in this case was demonstrably coercive and thus requires reversal.  
Farella
 relied upon a decision by the United States Court of Appeals for the Second Circuit, 
United States v. Jennings
, 471 F.2d 1310 (2d Cir. 1973).  In 
Jennings
, the trial judge instructed the jury as to the need for a unanimous verdict, although it cautioned the jurors not to sacrifice their beliefs as to the proper verdict merely for the sake of unanimity; this anti-deadlock instruction was affirmed despite the fact that the judge knew that 11 jurors favored conviction.  471 F.2d at 1314.  In the present case, the trial court instructed the jury as to the importance of unanimously agreeing on a verdict, although it offered the caveat that the jurors should do so "with an eye towards not doing violence to your own judgment."  We feel that this instruction is analogous to the one affirmed in 
Jennings
, and later approved of by 
Farella
.  

Moreover, defendant's trial counsel acquiesced in this supplemental instruction the first time the trial court addressed the jury on this matter, and counsel specifically requested the instruction be given when the court issued its second anti-deadlock admonition.  Therefore, defendant invited any error and cannot now be heard to complain.  
People v. Morgan
, 142 Ill. 2d 410, 452, 
568 N.E.2d 755, 769 (1991)(where the alleged error from a judge's remarks was caused by defense counsel, issue is waived on appeal), 
rev'd
 
on
 
other
 
grounds
, 
Morgan v. Illinois
, 504 U.S. 719, 119 L. Ed. 2d 492, 112 S. Ct. 2222 (1992).  Accordingly, we affirm the judgment of the trial court.

Affirmed.

BUCKLEY and O'BRIEN, JJ., concur.