THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
RANDY HARRELL, Defendant-Appellant.

Fourth District   No. 4—91—0320

Opinion filed March 19, 1992.

D. Peter Wise, of Metnick, Barewin & Wise, of Springfield, for appellant.

John Turner, State's Attorney, of Lincoln (Kenneth R. Boyle, Robert J. Biderman, and Jeffrey K. Davison, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE KNECHT delivered the opinion of the court:

The State's Attorney for Logan County charged defendant, Randy Harrell, by information with unlawful possession of more than 500 grams of cannabis (count I) (Ill. Rev. Stat. 1989, ch. 56½, par. 704(e)); unlawful possession with intent to deliver more than 500 grams of cannabis (count II) (Ill. Rev. Stat. 1989, ch. 56½, par. 705(e)); unlawful possession of less than 15 grams of a controlled substance (cocaine) (count III) (Ill. Rev. Stat. 1989, ch. 56½, par. 1402(b)); unlawful use of weapons (count IV) (Ill. Rev. Stat. 1989, ch. 38, par. 24–1(a)(7)); and two counts of armed violence (counts V and VI) (Ill. Rev. Stat. 1989, ch. 38, par. 33A–2).

Prior to trial, defendant filed a motion to suppress evidence. Defendant alleged that on April 27, 1990, members of the Illinois State Police, without a warrant or his voluntary consent, wrongfully entered and searched his residence, conducted an unconstitutional search of a room other than the one where he was arrested, and unlawfully seized items found in this room.

At the hearing on defendant's motion to suppress, Trooper Mackins testified that on April 27, 1990, he was operating radar on Route 121 and clocked a truck exceeding the speed limit. The driver drove to a house and ran inside. Mackins knocked on the door of the house and asked for the man who just ran inside. He explained to the woman who answered the door (later to be identified as Mrs. Harrell) he had just seen a suspect—who had been speeding—enter the house. She stated if he had a warrant he could search the house. He indicated to her he would be back and testified she appeared to be distraught.

Sergeant Anthony L. Walker testified he overheard a radio transmission by Mackins requesting assistance at a residence in Latham, Illinois. Walker then went to the residence. After speaking with Mackins, he knocked on the door, and Mrs. Harrell, holding a washcloth to her head, answered the door. He advised her Mackins had observed a suspect park a truck in her driveway and run into the house. He testified Mrs. Harrell appeared to have been lying down, and she stated

she had a migraine. Mrs. Harrell stated no one else was in the house and responded the truck outside belonged to her son. She indicated she did not know where her son was, and she did not believe he had run into the house while she was lying down. Walker testified she said, "You're welcome to look if you want to." Walker asserted once they were in the house he advised her if she knew where her son was hiding, she should tell them because she would be charged with obstructing justice if she, in fact, had knowledge the man had fled into the residence. He acknowledged the report he had written did not state he was in the house when he told Mrs. Harrell this. Rather, the report indicated he said this to her immediately after she answered the door. However, he testified the report was not in chronological order.

Conversely, Lois Harrell testified she was lying down because she had a migraine when she heard the doorbell. She answered the door, and a trooper asked to see the man who had run into the house. She told the trooper she had been lying down and had not seen or heard anybody run into the house. The trooper responded, "Oh, yep, you did," and said he knew somebody had run into the house. He asked who the truck belonged to and if his name was Randy. She responded he seemed to know all the answers, and he told her he would handle this in another way and left. She lay back down and approximately 15 minutes later the doorbell rang, and there was beating on the door. Three troopers were standing on the porch. She again indicated she had not heard anyone enter the house and asked if they had a warrant. She testified the troopers told her they did not need a warrant, and they had a right to come in. If they found the suspect in the house, they were going to charge her with a felony. She testified she "sort of stepped back and they stepped in the house." She stated she did not give them permission to come into the house.

Once in the house, Walker searched the main floor. Trooper Lindemulder initially searched the basement. When nothing was found, he went to the upstairs bedroom to search. (This search will hereinafter be referred to as the first search.) While looking under a bed, which was raised six inches above the floor, he observed cannabis seeds, a pan with a screen which had cannabis seeds on it, a strong odor of cannabis, and paraphernalia on the shelves adjacent to the bed. This contraband was not removed until after the defendant had been located. He estimated 5 to 10 grams of cannabis and cannabis seeds were discovered in this initial sighting. After he found the cannabis seeds, he noticed a section of paneling which was not properly intact to the wall. He peeled the paneling back and crawled through a nar-

row passageway which led to an unfinished portion of the attic, where he then observed the defendant. Defendant, while still in the attic, was handcuffed with his hands behind his back. He was escorted downstairs assisted by two troopers, one in front and one in back of him, and placed in Mackins' squad car.

Lindemulder, who stayed in the house while defendant was escorted to the squad car, returned to the area where he had discovered the cannabis and collected it. This recovery was clearly permissible. Walker also returned to this area to search further, in what will be referred to hereinafter as the second search. Because of the strong odor of cannabis, Lindemulder then began to pull objects from under the bed. As he pulled things out, he noticed more cannabis. This "second search" revealed a green Tupperware container containing cannabis, a brown paper bag containing a syringe and three test tubes, several baggies containing cannabis, and a red duffel bag containing several bags of cannabis. A loaded shotgun in a zippered bag (count V) was also found behind the bed. Walker indicated he could not tell it was a shotgun until it was uncased, and he did not know what was inside the red duffel bag until it was opened. Lindemulder testified the amount of cannabis found in this second search was approximately 200 to 250 grams.

After the second search, Walker and Lindemulder went downstairs and called headquarters in an attempt to obtain a search warrant. After waiting about five hours to get a warrant, Walker contacted headquarters again and was instructed to "secure the scene." Walker indicated "secure the scene" actually meant they were to leave the scene. However, the troopers instead decided to finish "the probable cause search of the subject's room" and the area where defendant had been found. No other part of the house was searched. This subsequent "third search" revealed another duffel bag containing cannabis and a sawed-off shotgun. The weapon was found under some clothing on an unused bed (count VI), and the bag was found behind the unused bed. Various containers with cannabis and cocaine also were recovered during this search from the shelves adjacent to the bed, and several bags of cannabis were found in drawers next to the bed.

During the five hours the troopers were trying to obtain a warrant, friends and family arrived at the residence. Mackins was assigned to watch them, and he had a clear view of them. Mrs. Harrell, as well as the guests, was in the living room. Natalie Foster, defendant's sister, was one of the people who came to the house. After the troopers tried to obtain a warrant, they told her they had probable

cause to search the defendant's room. She testified the officers did not restrain her movement in the house.

Based on this evidence, the circuit court denied defendant's motion to suppress. Viewed in the totality of the circumstances, the court found Mrs. Harrell gave a voluntary consent and resolved the issue of credibility in favor of the State. Based on the facts—(1) the officer's discovery of contraband in plain view during the first search; (2) the diligent attempt to obtain a warrant; (3) the knowledge individuals were entering the residence; (4) the knowledge contraband could be altered, disposed of, or concealed; and (5) the fact the contraband was found in an area usually controlled by the defendant—the court maintained the officers could have believed exigent circumstances existed justifying their search. Therefore, the court concluded the officers acted reasonably, and the warrantless entry was permissible.

A bench trial was held, and the court again concluded the searches were reasonable. It stated that based on the initial entry and what was found, it was not convinced the officers needed to obtain a search warrant since "search probable cause appeared to exist." Turning to the charges, the judge entered a judgment of guilty on counts I, II, III, IV and VI; and found count V was not proved beyond a reasonable doubt. Thereafter, the court found the judgment on count I was merged with count II, and judgment on count I therefore was vacated and set aside. Defendant was sentenced to six years' incarceration on count II, three years on count III, five years on count IV, and six years on count VI, all to run concurrently.

The defendant appeals, contending (1) the trial court erred in ruling the State Police had obtained consent from Mrs. Harrell to enter the residence, (2) the evidence found by the police during the second search was not within his "immediate control," (3) exigent circumstances did not exist which would allow a warrantless search of a portion of his residence, and (4) the State failed to prove he committed the offense of armed violence. We hold the trial court erred in not suppressing certain of the evidence obtained during the second and third searches, *i.e.*, that not first discovered in plain view during Lindemulder's first search of the room for defendant, and we therefore reverse defendant's convictions and remand this case with directions.

## I. CONSENT

■ The fourth amendment generally prohibits "unreasonable searches and seizures." A warrantless search is *per se* unreasonable unless it falls within one of the recognized exceptions. (*Katz v. United States* (1967), 389 U.S. 347, 357, 19 L. Ed. 2d 576, 585, 88 S. Ct. 507,

514.) In Illinois, those few exceptions are (1) a search based on consent, (2) a search incident to arrest, and (3) a search predicated upon probable cause where there are exigent circumstances which make it impractical to obtain a warrant. (*People v. Gardner* (1984), 121 Ill. App. 3d 464, 468, 459 N.E.2d 676, 679.) Here, the initial search was based on the theory of the consent of Mrs. Harrell.

At the hearing on the motion to suppress, there was conflicting testimony relating to whether Mrs. Harrell actually gave consent to the troopers to search the house. However, on appeal, defendant does not argue Mrs. Harrell did not consent, but rather her consent was involuntary because (1) she had a migraine; (2) was "scared to death"; and (3) was told by the police they did not need a search warrant and had a right to come in, and if they found the suspect in the house, she would be charged with obstructing justice. Alternatively, defendant argues if her consent was given voluntarily, it was strictly limited to searching for the person who had allegedly entered the house. Therefore, the troopers exceeded the scope of the consent by continuing to search the house *after* defendant had been apprehended and removed from the premises.

A circuit court's determination on a motion to suppress will not be overturned unless manifestly erroneous. (*People v. Winters* (1983), 97 Ill. 2d 151, 158, 454 N.E.2d 299, 303; *People v. Holloway* (1981), 86 Ill. 2d 78, 91, 426 N.E.2d 871, 877.) Further, a trial court's finding on the issue of whether consent was voluntary involves credibility determinations, and thus a reviewing court will not overturn the circuit court's findings unless they are contrary to the manifest weight of the evidence. (*People v. Kenning* (1982), 110 Ill. App. 3d 679, 684, 442 N.E.2d 1337, 1340-41; *People v. Casazza* (1991), 144 Ill. 2d 414, 417-18, 581 N.E.2d 651, 653 (the trial court's determination on voluntariness will not be disturbed unless clearly erroneous).) " 'Because a court of review is not in a position to observe the witness as he testifies, questions of credibility and the weight to be given his testimony must be left largely in the discretion of the trial court.' " (*People v. DeMorrow* (1974), 59 Ill. 2d 352, 358, 320 N.E.2d 1, 5, quoting *People v. Peterson* (1959), 17 Ill. 2d 513, 515, 162 N.E.2d 380, 381.) The rule for determining the voluntariness of a consent is as follows: it must be shown from the totality of the circumstances that the consent was not the result of duress or coercion, express or implied, but was, in fact, freely given. *Schneckloth v. Bustamonte* (1973), 412 U.S. 218, 248, 36 L. Ed. 2d 854, 875, 93 S. Ct. 2041, 2059.

■ The voluntariness of the consent is, in part, dependent upon the testimony concerning events leading up to the search. Viewing

the totality of the circumstances, it was not contrary to the manifest weight of the evidence for the court to determine the testimony of the troopers was more credible, and Mrs. Harrell's consent had been given voluntarily. Based on Mrs. Harrell's relationship to the defendant and Officer Walker's testimony that his report was not in chronological order, the court could reasonably conclude the trooper's testimony was more credible. In evaluating the voluntariness of the consent, the court could have disbelieved Mrs. Harrell's testimony that she was advised she would be arrested for obstructing justice before she consented to the search for the defendant, as well as her statement that the police said they could enter without a warrant. Mrs. Harrell's feeling ill and distraught does not render her consent involuntary. Nothing in the evidence indicated conduct by the police which rose to the level of coercion or duress. See *People v. Posey* (1981), 99 Ill. App. 3d 943, 426 N.E.2d 209; *People v. Paull* (1988), 176 Ill. App. 3d 960, 531 N.E.2d 1008.

We turn next to determine whether the searches exceeded the scope of the consent. Although consenting to a search waives the warrant requirement, it does so only within the scope of the consent. *People v. Corral* (1986), 147 Ill. App. 3d 668, 674, 498 N.E.2d 287, 291; *People v. Schmoll* (1943), 383 Ill. 280, 284, 48 N.E.2d 933, 934.

■ In Officer Walker's testimony, he stated he explained to Mrs. Harrell that Mackins saw the suspect park his truck in the driveway and run into the house. He indicated she stated she did not believe anyone was in the house, but they were welcome to look. Based on this testimony, Mrs. Harrell's consent was limited to a search for the suspect and did not include authorization for the troopers to continue to search the house once the defendant was apprehended and removed. The police never asked permission to search the house after defendant was found and taken from the premises. There is no indication Mrs. Harrell's consent was continuing in nature or extended to subsequent searches of the house for things other than the suspect, nor is there any indication in the record the officers believed it was or did. (See *People v. Kelk* (1991), 208 Ill. App. 3d 313, 566 N.E.2d 835; *People v. Jackson* (1978), 57 Ill. App. 3d 720, 373 N.E.2d 729.) Additionally, courts have stated it is the general rule that consent is normally given upon the understanding that such a search would be conducted forthwith and only a single search would be conducted. (*People v. Shelton* (1982), 110 Ill. App. 3d 625, 629-30, 442 N.E.2d 928, 932.) Therefore, the second and third searches were outside the scope of Mrs. Harrell's consent. This does not mean the evidence seized during these searches is inadmissible. Rather, it means the evidence seized

without the benefit of a warrant must fall within another exception to the warrant requirement in order to be admissible.

## II. PLAIN VIEW

■ Although the defendant does not seem to argue the first search was unconstitutional, it should be explained this search was constitutional under the "plain view doctrine." In *Horton v. California* (1990), 496 U.S. 128, 110 L. Ed. 2d 112, 110 S. Ct. 2301, the Supreme Court ruled the fourth amendment permitted the warrantless seizure of evidence in plain view even though the discovery was not inadvertent. For warrantless seizures to be valid under the plain view doctrine, the court held two conditions must be met in addition to the essential predicate "the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed." (*Horton,* 496 U.S. at 136, 110 L. Ed. 2d at 123, 110 S. Ct. at 2308.) The two requirements are straightforward: (1) the object's incriminating character must be " 'immediately apparent' " (*Horton,* 496 U.S. at 136, 110 L. Ed. 2d at 123, 110 S. Ct. at 2308, quoting *Coolidge v. New Hampshire* (1971), 403 U.S. 443, 466, 29 L. Ed. 2d 564, 583, 91 S. Ct. 2022, 2038), and (2) the officer must have a "a lawful right of access to the object itself" (*Horton,* 496 U.S. at 137, 110 L. Ed. 2d at 123, 110 S. Ct. at 2308).

■ Applying these requirements to this case, it is clear the recovery and seizure of the evidence discovered in plain view during the initial search for defendant was properly admitted. The troopers were lawfully in the house searching for the defendant pursuant to Mrs. Harrell's consent. The trooper had a right to be in the position he was in when the cannabis seeds on the screen were spotted because he was looking for the defendant in a place where he could be located. Additionally, based on the officer's training, it was immediately apparent to the officer that certain of the evidence, *e.g.*, the cannabis seeds, likely constituted contraband.

However, the State argues the seizure of additional items first discovered during the second and third searches was also lawful under the plain view doctrine. We hold the evidence initially discovered during the subsequent searches was not lawfully obtained under this doctrine. For this doctrine to apply, the police must have a lawful right to be on the premises. While the police had a right to reenter and recover the evidence of contraband which had been spotted in plain view in the first and lawful search for defendant, they had no right to go beyond collecting this contraband, *i.e.*, to seek to discover additional contraband. Accordingly, much of which we have referred to as

the second and third search exceeded the scope of consent and no other exception rendered further searching permissible. Even though the police lawfully reentered the room to retrieve evidence discovered during the first search, the officers did not have a right to continue searching. Therefore, as to certain of the evidence initially discovered in the second and third searches, the police violated the fourth amendment because they arrived at the place from which the evidence was viewed in derogation of the fourth amendment.

Additionally, the incriminating character of certain of this evidence was not "immediately apparent." The evidence was not discovered until Lindemulder began pulling things out from under the bed. Moreover, some of the contraband was found in duffel bags under the beds and in drawers. One gun was found behind a bed (count V), and the other was found under some clothing (count VI). It was not until the evidence was opened that its allegedly illegal contents was discovered. It is clear the doctrine of plain view cannot be utilized to validate these later searches.

### III. IMMEDIATE CONTROL

Defendant argues the gun and contraband discovered during the second search should have been suppressed because these items were not in his immediate control. The basic guidelines for a permissible search incident to a lawful arrest were set forth in *Chimel v. California* (1969), 395 U.S. 752, 23 L. Ed. 2d 685, 89 S. Ct. 2034. In *Chimel*, the Supreme Court stated:

> "When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape. Otherwise, the officer's safety might well be endangered, and the arrest itself frustrated. In addition, it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction. And the area into which an arrestee might reach in order to grab a weapon or evidentiary items must, of course, be governed by a like rule. A gun on a table or in a drawer in front of one who is arrested can be as dangerous to the arresting officer as one concealed in the clothing of the person arrested. There is ample justification, therefore, for a search of the arrestee's person and the area 'within his immediate control'—construing that phrase to mean the area from within which he might gain possession of a

weapon or destructible evidence." *Chimel*, 395 U.S. at 762-63, 23 L. Ed. 2d at 694, 89 S. Ct. at 2040.

Without specifically defining what constituted the area within an arrestee's "immediate control," the Court emphasized:

"There is no comparable justification, however, for routinely searching any room other than that in which an arrest occurs— or, for that matter, for searching through all the desk drawers or other closed or concealed areas in that room itself. Such searches, in the absence of well-recognized exceptions, may be made only under the authority of a search warrant. The 'adherence to judicial process' mandated by the Fourth Amendment requires no less." *Chimel*, 395 U.S. at 763, 23 L. Ed. 2d at 694, 89 S. Ct. at 2040.

■ Viewing the totality of the circumstances, we hold the area searched was not within the immediate control of the defendant. When defendant was located, he was found in an unfinished portion of the attic. To obtain entrance to this area, one must remove a piece of paneling and walk through a narrow passageway, approximately three or four feet high, before entering the unfinished portion of the attic. The entrance to the unfinished attic was eight feet to the right of the stairs to defendant's bedroom and approximately 20 feet from his bed. Subsequent to defendant being located, he was handcuffed in the unfinished portion with his hands behind his back and escorted outside to the squad car. As he was being escorted downstairs, there was a policeman in front and one in back of him. Defendant did not have access to the area the police officer later searched, nor did he walk by this area as he was escorted downstairs. Defendant was handcuffed and the troopers had complete control of the situation, so there was no fear of defendant destroying evidence or obtaining weapons to resist arrest or escape. Therefore, the evidence first discovered during the second and third search cannot be admitted under the exception for a search incident to arrest. See *People v. Williams* (1974), 57 Ill. 2d 239, 311 N.E.2d 681; *People v. Bishop* (1978), 60 Ill. App. 3d 940, 377 N.E.2d 585.

### IV. EXIGENT CIRCUMSTANCES

The trial court also held exigent circumstances existed to justify the second and third searches.

In *People v. Kelley* (1982), 104 Ill. App. 3d 51, 53, 432 N.E.2d 630, 632, this court noted that in *Jones v. United States* (1958), 357 U.S. 493, 497-98, 2 L. Ed. 2d 1514, 1518-19, 78 S. Ct. 1253, 1256-57, the Supreme Court concluded "probable cause for belief that certain

articles subject to seizure are in a dwelling cannot of itself justify a search without a warrant." Further, this court stated "[t]he destructibility of evidence [did] not by itself excuse the lack of a warrant." (*Kelley*, 104 Ill. App. 3d at 54, 432 N.E.2d at 632.) Because the deputies were not in danger and did not know whether the defendant had arranged for the disposal of the contraband, this court held exigent circumstances did not exist.

In *People v. Cohen* (1986), 146 Ill. App. 3d 618, 496 N.E.2d 1231, the State asserted an exigent circumstance was supplied because drugs could be destroyed, and the defendant had warned others the police were in the house. The court stated "[t]he general rule in Illinois is that the potential destruction of evidence, standing alone, does not excuse obtaining a warrant." (*Cohen*, 146 Ill. App. 3d at 625, 496 N.E.2d at 1236 (and cases cited therein).) Therefore, the court concluded exigent circumstances were not present to validate the officer's warrantless entry and search of the residence. See generally *Vale v. Louisiana* (1970), 399 U.S. 30, 26 L. Ed. 2d 409, 90 S. Ct. 1969; 2 W. LaFave, Search & Seizure §6.5(a), at 655, 658 (2d ed. 1978); *United States v. Rubin* (3d Cir. 1973), 474 F.2d 262; *People v. Ouellette* (1979), 78 Ill. 2d 511, 401 N.E.2d 507; *People v. Condon* (1992), 148 Ill. 2d 96.

■■ Based on these cases, the searches to discover additional contraband—in contrast to the trooper's conduct directed at recovering the contraband he had already seen in plain view while lawfully searching for defendant—after defendant's arrest could not be based upon exigent circumstances. Here, there was no evidence the officers knew or believed any contraband Trooper Lindemulder had seen would be destroyed. Although there were people in the house, they remained on the first floor in the presence of an officer. Neither was there any indication these people knew drugs were located in the house or would attempt to conceal, destroy, or remove the drugs. Additionally, the defendant no longer posed a threat. He was handcuffed and was sitting in the squad car. Therefore, no exigency existed, and the seizure was in derogation of the defendant's fourth amendment rights.

## V. ARMED VIOLENCE

■■ Because of resolution of the other issues in this case, we need not address defendant's argument that the State failed to prove he committed the offense of armed violence (count VI). The sawed-off shotgun identified in count VI was discovered during the illegal third

search and, therefore, is inadmissible. Defendant's conviction of armed violence (count VI) is reversed.

## VI. CONCLUSION

Accordingly, we reverse defendant's convictions insofar as they were based on evidence initially discovered during the second and third searches. We conclude any contraband first discovered as a result of Officer Lindemulder's initial search for the defendant, *i.e.*, the cannabis and seeds on the screen Lindemulder observed under the bed, which he testified had a weight of 5 to 10 grams, and any contraband on the shelves which he first saw and perceived as such while lawfully searching for the defendant, was recoverable without a warrant and was admissible for criminal prosecution. We remand to the trial court for further hearing with the limited purpose of determining what items and what amounts were properly recovered as a result of Trooper Lindemulder seeing them in plain view during his initial search of defendant's room and then perceiving them to be contraband. As to counts I to IV, any amounts lawfully recovered may support the entry of convictions on the charged offenses or any included offenses thereof, *e.g.*, unlawful possession of cannabis, and defendant may thereafter be sentenced on those convictions with credit for time served to date.

Reversed and remanded with directions.

STEIGMANN and LUND, JJ., concur.