No. 5-97-0474

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

THE PEOPLE OF THE STATE OF ILLINOIS,

Plaintiff-Appellee,

v.

DARRELL DALE,

Defendant-Appellant.

)

)

)

)

)

)

)

)

Appeal from

Circuit Court of

Macon County

96CF475

Honorable

James A. Hendrian,

Judge Presiding.

_________________________________________________________________

JUSTICE STEIGMANN delivered the opinion of the court:

In May 1996, the State charged defendant, Darrell Dale, with posses­sion of a controlled substance with intent to deliver (15 grams or more but less than 100 grams of a sub­stance contain­

ing heroin) with a prior conviction of possession of a con­trolled sub­stance with intent to deliver (720 ILCS 570/401(a)(1)(A) (West Supp. 1995)).  In July 1996, defen­dant filed a motion to suppress evidence obtained from the motel room in which he was staying.  In Septem­ber 1996, the trial court held a hearing on defendant's motion and later denied it.  In June 1997, the court conducted a stipulated bench trial, found defen­dant guilty of the offense, and sentenced him to eight years nine months in prison. 

Defendant appeals, arguing only that the trial court erred by denying his motion to suppress evidence.  We reverse.

I. BACKGROUND

At the September 1996 hearing on defendant's motion to suppress evidence, the trial court heard testimony from defen­

dant, the motel manager, and two of the police officers who obtained evidence from defendant's motel room.  That testi­mo­ny showed the follow­ing.

On January 19, 1996, defendant was renting a room at a Decatur motel on a day-to-day basis.  Motel personnel had noticed an unusu­al­ly high volume of traffic in and out of defendant's room, and the cleaning staff had observed items in the room that they suspected were related to drug trafficking.  Accordingly, the motel manager decided to tell defendant he could no longer stay at the motel.  Because of his concern for safety and securi­

ty, the manager called the Decatur police and asked them to remove defen­dant from the premises.

When the police officers arrived, they knocked on the door to defendant's room and identified themselves.  Defendant let the offi­cers enter his room and also consent­ed to being frisked.  The police found several hundred dollars in cash on defendant's person.  Defen­dant then con­sent­ed to a search of the room, but he withdrew his consent shortly after the officers began looking around the room.  

When defendant withdrew his consent, the offi­cers informed him that the motel manager wanted him to leave.  He agreed to do so.  At that point, one of the offi­cers "ad­vised [defendant] that [the police] would stand by *** while he got his things and left the room."  Defen­dant made no protest.

One of the officers went to the closet, where defen

dant's clothes were hanging, and started squeezing them "to make sure [they contained] no weapons or anything."  That officer took articles of clothing out of the closet and handed them to defen

dant, who began packing them into a paper bag.

During this process, a small, clear plastic bag con­

taining a white powdery sub­stance appeared on the floor at defendant's feet.  The police handcuffed defendant and con­ducted a field test on the substance inside the plastic bag.  The test yielded a negative result.  

The police then released defendant and told him that he could leave; however, they also told him that he could not take any of his belongings out of the room.  After defen­dant left the motel, the police had the motel manager modify the door lock in such a way that only the police--and not defendant--could obtain access to the room.  One officer waited in the motel lobby, while two other officers went to obtain a search war­rant.  

These two officers took the plastic bag containing the white powdery substance to the Decatur police head­quar­ters, tested it again, and obtained a positive result for the presence of co­caine.  The search warrant application includ­ed informa­tion about the white powdery substance and the posi­tive test result.

Later that same day, a judge issued a search war­rant, and the police executed it.  From within defendant's former motel room, they seized 16.5 grams of a sub­stance con­tain­ing heroin, elec­tronic scales, documents that appeared to be records of drug traffick­ing, and some packag­ing material.  

In May 1996, the State charged defendant as earlier stated.  In July 1996, defendant moved to suppress every­thing that the police seized both before and during the execution of the search war­rant.  In September 1996, the trial court conducted a hearing on this motion and later denied it in a written order.  The court subsequently convicted defendant at a stipu­lat­ed bench trial and sentenced him as stated.

This appeal followed.

II. THE MOTION TO SUPPRESS

Defendant argues that because the police in this case violated the fourth amendment's prohibition against unreasonable searches and seizures (U.S. Const., amend. IV), the trial court erred by denying his motion to suppress the evidence they ob­

tained from the motel room.  We agree.

Although defendant's motion to suppress sought to exclude all the items seized on January 19, 1996, none of defen

dant's argu­ments on appeal relate to the cash that the police seized during their pat-down of defendant.  Accord­ing­ly, we address only those contentions relating to the drugs, scales, docu­ments, and packag­ing material.

The small plastic bag that fell on the floor while defendant was packing his belongings is at the center of this appeal.  Everything else that followed is a result of the offi­

cers' discovery of that bag.  Because fourth amendment protections apply to a rented motel room just as they apply to a person's home (
People v. Kozlowski
, 278 Ill. App. 3d 40, 44, 662 N.E.2d 630, 633 (1996)), and motel personnel cannot waive the constitu­tional protections of their guests (
People v. Vought
, 174 Ill. App. 3d 563, 568, 528 N.E.2d 1095, 1099 (1988)), we must first examine whether the seizure of the small plastic bag complied with the requirements of the fourth amendment.  We con­

clude that it did not.  We also con­clude that the police had no lawful authori­ty to order defen­dant to leave all of his belong­ings in the motel room when he left.

A. The Small Bag That Appeared on the Floor

The State claims that the plain view doctrine applies to the police officers' seizure and testing of the small bag that ap­peared at defendant's feet while he was packing his belongings.  The plain view doc­trine autho­riz­es the police to seize an item without a search warrant when the following require­ments are satis­fied: (1) the police view the item from a place where they are legally entitled to be; and (2) it is immediately apparent to the police that the item may be evidence of a crime, contra­band, or other­wise subject to seizure.  
People v. Edwards
, 144 Ill. 2d 108, 134, 579 N.E.2d 336, 345 (1991); 
People v. Watkins
, 293 Ill. App. 3d 496, 502, 688 N.E.2d 798, 802-03 (1997).  

We begin our analysis by focusing on the first prong of this test--that is, whether the police were legally entitled to be in defendant's room at the time that the small bag appeared on the floor.  The State argues that the officers' presence in the motel room was lawful because (1) defen­dant con­sent­ed to their pres­ence; (2) exigent circum­stances justified their presence; and (3) the police were lawful­ly engaged in an eviction.  Because we reject all three of these justi­fi­ca­tions, we need not address the second prong of the test for applying the plain view doctrine.

1. Defendant's Consent

The State contends that the police were present in defendant's motel room by invitation because, after defendant con­sent­ed to the officers' initial entry into the room, he never told the offi­cers that he wanted them to leave the premis­es while he packed.  We disagree.

The police may not enter premis­es with con­sent and then exceed the scope of that consent once inside.  
People v. Harrell
, 226 Ill. App. 3d 866, 873, 589 N.E.2d 943, 948 (1992); 
People v. Coleman
, 194 Ill. App. 3d 336, 340-41, 550 N.E.2d 1263, 1267 (1990).  Thus, the scope and dura­tion of the officers' lawful presence in defendant's room was gov­erned by the scope of his consent and not, as the State argues, by the scope of their ultimate purpose in visiting him.  Here, the police asked defen­

dant if they could "step in and speak with him," and his consent that they may do so was limited by the circum­stances of that re­

quest.  See 
People v. Kelk
, 231 Ill. App. 3d 797, 800-01, 596 N.E.2d 1267, 1269 (1992) (considering context of officer's request to search defendant's car in deter­mining the scope of defendant's consent).  According­ly, defendant only con­sent­ed to having the police enter the room to talk to him--not to watch him pack his belong­ings.

Despite these principles, the State contends that the offi­cers could reasonably assume, absent a request for them to leave, that defendant's consent to their presence was ongoing.  This argument might be interesting in the proper case--namely, where the police obtain consent to enter a person's motel room and then simply announce that the motel manage­ment has asked them to evict that person.  In such a case, if the person were to begin packing in front of the officers, his silence 
might
 be viewed as implying his contin­uing consent to the officers' pres­

ence in the room.  

However, that hypothetical situation is not this case.  Here, defen­dant had just finished telling the offi­cers that he did not wish for them to search his room.  The officers' response essentially was: "You mean we can't go through all of your person­al belong­ings?  Okay, then you pack up all your person­al belong­ings and we'll stand here and watch you do it."  One of the officers went one step further, actually removing articles of defendant's clothing from the closet, squeezing them (for the express purpose of determining whether they contained any weapons or contra­band), and then handing them to defen­dant.  

We do not view the officers' words and conduct as the opening of a dialog on the subject of whether they should stay in the motel room.  Instead, their words and conduct consti­tut­ed a 
direc­tive
.  Thus, defen­dant then had three choices.  He could either (1) argue with the police; (2) forcibly attempt to remove the police from the room; or (3) accede to the officers' asser­

tion of authori­ty.  That defendant chose the third of these three options hardly consti­tutes consent. 

The State's contrary position is untenable.  Adopting such a position would require sus­pects, when faced with a clear asser­tion of police author­ity, to resist.  Not only would public safety not be en­hanced by adopting such a rule, it would be diminished.  A person faced with a show of police author­ity should always feel secure obeying the com­mands of a police offi­

cer; the failure to obey can result in crimi­nal liabil­i­ty.  See 
People v. Villarreal
, 152 Ill. 2d 368, 374-75, 604 N.E.2d 923, 926 (1992) (crime to resist arrest, even if arrest in unlawful).

Accordingly, we conclude that the State may not rely on defendant's previous consent for the officers to enter his motel room--for the limited purpose of talking to him--to justify their pres­ence there when the small plastic bag appeared on the floor. 

2. Exigent Circumstances

Citing only 
People v. Testa
, 125 Ill. App. 3d 1039, 466 N.E.2d 1126 (1984), the State alternatively argues that the offi­cers proper­ly re­mained in defendant's motel room in response to exigent circum­stanc­es.  In 
Testa
, the police arrested the defen­

dant at his residence, while the defendant was wearing only under­wear.  The police allowed the defendant to go to his bedroom and dress, but they accompanied him.  
Testa
, 125 Ill. App. 3d at 1042, 466 N.E.2d at 1130.  The court reached the unsurpris­ing conclu­sion that it was reason­able for the police to keep the defendant in their sight after arresting him.  
Testa
, 125 Ill. App. 3d at 1043, 466 N.E.2d at 1130. 

In the present case, defendant was not under arrest when the police informed him that they would stay in his room.  The officer who made that decision explained it as fol­lows:

"Q. [Defense Counsel:] Why didn't you go out­side and wait outside while [defen­dant] packed his own clothing?

A. We have had situations like that w[h]ere we have ended up in [a] barricade cir­cumstance.

[Defendant] had his little daughter there, and we had no idea what the situation was, you know.  If he was supposed to have her or whatever, and [it is just] a prac­tice for officer safety that we don't let anyone get out of our sight once we make contact.  They can always obtain a weapon, if they have one; and for officer safety we don't do that."

The State bears the burden of demonstrating the exis­

tence of exigent circumstances, thereby justifying a war­rant­less search or sei­zure.  
People v. McNeal
, 175 Ill. 2d 335, 345, 677 N.E.2d 841, 846 (1997).  In deter­min­ing whether exigent circum­

stanc­es exist, the court must consider all the facts and circum­

stances of the particular case and decide whether the police responded reason­ably to the situa­tion con­fronting them.  
McNeal
, 175 Ill. 2d at 345-46, 677 N.E.2d at 847.  No exigency for officer safety exists unless the suspect's conduct consti­tutes "'an immediate and clear danger to the police or to the safety of those around him.'"  
People v. Galdine
, 212 Ill. App. 3d 472, 483, 571 N.E.2d 182, 189 (1991), quoting 
People v. Foskey
, 136 Ill. 2d 66, 78, 554 N.E.2d 192, 198 (1990). 

Here, the police remained in defendant's motel room because it was their prac­tice to do so.  In other words, the police were not responding to any exigency particular to the situation before them.  The requisite showing of "immediate and clear danger" to officer safety was clearly lacking.

The State attempts to bolster its argument by pointing out that one of the officers knew that defen­dant had fought with police in the past.  We are unpersuaded.  First, this contention the State presents on appeal contra­dicts the testimony of the officer who actually decided the police would stay in defendant's room.  Second, the State did not present any evidence at the suppression hearing to demonstrate that defendant was resis­tant or aggres­sive toward the offi­cers during this particular encoun­

ter.  

Our conclusion might be different if the State had shown that defen­dant was threaten­ing the police officers, ex­

press­ing anger at the situa­tion, or refusing to vacate the room.  Like­wise, the State may be able to carry its burden by presenting evidence that the entire police-citizen encounter took place under circum­stanc­es where it is reasonable to expect--even in the absence of threatening conduct in the presence of the police--the citizen to be in an aggressive mood, such as when the police respond to a report of domes­tic violence.  However, the record before us is devoid of any such evidence.  In short, the State failed to meet its burden of demonstrating that exigent circum­

stances existed in this case.

3. The Lawful Eviction of Defendant

Finally, the State suggests that the police properly responded to the motel manager's request to aid in evicting defen­dant, and thus the officers were lawfully in defendant's room while he was packing his belongings.  Although we agree that the police officers were acting within their authority when they re­sponded to the motel manager's request to escort defendant from the premises, we disagree with the State's assertion that evict­

ing a motel tenant pro­vides an independent exception to the fourth amendment.   

Although the State has not explic­itly used the term, we view the State's argument as being that the police were properly performing their "community caretaking" function when they agreed with the motel manager's request that the police assist in remov­

ing defen­dant from his motel room.  In 
People v. Murray
, 137 Ill. 2d 382, 387, 560 N.E.2d 309, 311-12 (1990), our supreme court de­

scribed the commu­ni­ty care­tak­ing func­tion as follows:

"There are, theoretically, three tiers of police-citizen encounters.  [Citation.]  One tier in­volves an arrest of a citizen, which action must be supported by probable cause ***.  [Citation.]  The next tier in­volves a so-called '
Terry
' stop, a brief seizure that must be supported by a reason­

able suspicion of criminal activity ***.  [Citation.]  The last tier involves no coer­

cion or detention and therefore does not involve a seizure.  This tier is commonly known as the community caretaking function or public safety function."

The court went on to note that the community caretaking func­tion of the police frequently is "'totally divorced from the detec­

tion, inves­ti­ga­tion, or acqui­si­tion of evidence relating to the viola­tion of a crimi­nal stat­ute.'"  
Murray
, 137 Ill. 2d at 388, 560 N.E.2d at 312, quoting 
Cady v. Dombrowski
, 413 U.S. 433, 441, 37 L. Ed. 2d 706, 714-15, 93 S. Ct. 2523, 2528 (1973).

In this case, the motel manager's desire to avoid a con­fron­tation with a guest under these circum­stances is entire­ly reason­able, and his decision to terminate defendant's occupation of the motel room, once he suspected that defendant was traffick­

ing drugs from the room, is commendable.  Likewise, we commend the police officers for their will­ing­ness to facili­tate defendant's peace­ful removal from the motel.  Such activity is entire­ly consis­tent with their duties as "peace offi­cers" (720 ILCS 5/2-13 (West 1994) (defining a "peace offi­cer" as one "vested by law with a duty to maintain public or­der")), and it comports with the discus­sion of the community caretaking function of the police discussed in 
Murray
.  

Neverthe­less, the community caretaking function does not provide an independent exception to the requirements of the fourth amendment.  Instead, it is a moniker used to describe consensual encounters between the police and members of the public.  As the supreme court in 
Murray
 noted, the public care­

tak­ing func­tion of the police applies to encounters that involve "no coer­cion."  
Murray
, 137 Ill. 2d at 388, 560 N.E.2d at 312; see also 
People v. Smith
, 266 Ill. App. 3d 362, 365, 640 N.E.2d 647, 649 (1994) ("Of course, a person questioned by the police pursu­ant to their community caretaking or public safety function remains free to decline to answer the officers' ques­tions").  Thus, our earlier rejection of the State's conten­tion that the police officers remained in defendant's motel room by consent forecloses the State's attempt to use community caretak­ing to justify the officers' presence in that room.

Accordingly, we conclude that the police were not lawfully present in defendant's motel room at the time that the plastic bag appeared on the floor.  The plain view doctrine did not apply, and the police officers unlawfully seized the bag and its con­tents.

B. The Order for Defendant To Leave His Possessions 

in the Room

We also conclude that the police lacked authority to order defendant to leave his possessions in the motel room while the police sought a search warrant.  In reaching the opposite conclu­sion, the trial court relied on the follow­ing language from 
Vought
, 174 Ill. App. 3d at 571, 528 N.E.2d at 1100:

"[A]ny potential danger to hotel employees [from the presence of narcotics in a hotel room] could have been averted by locking the door to [the room] and preventing entry while a search warrant was sought."

Both the United States Supreme Court and the Supreme Court of Illinois have addressed the propriety of such premises lockouts.  In 
Segura v. United States
, 468 U.S. 796, 82 L. Ed. 2d 599, 104 S. Ct. 3380 (1984), the Supreme Court of the United States issued a highly fractured opinion containing the following passage:

"[S]ecuring a dwelling, on the basis of probable cause, to prevent the destruction or removal of evidence while a search warrant is being sought is not itself an unreasonable seizure of either the dwelling or its con­

tents."  
Segura
, 468 U.S. at 810, 82 L. Ed. 2d at 612, 104 S. Ct. at 3388.

However, as our own supreme court has pointed out, the portion of the 
Segura
 opinion containing that passage represented the view of only Justice O'Connor and Chief Justice Burger.  Thus, it is not binding precedent.  
People v. Casazza
, 144 Ill. 2d 414, 418-

19, 581 N.E.2d 651, 654 (1991).

The 
Casazza
 court went on to examine 
Segura
's underpin­

nings to determine whether they compelled the conclusion that the police have the authority to "seize" premises while seeking a search warrant.  The court concluded that the police lack such authority (
Casazza
, 144 Ill. 2d at 424, 581 N.E.2d at 656), and we view this conclusion as overruling the contrary language found in 
Vought
 upon which the trial court relied.  

Other than the reference to 
Vought
, the State provides no justification for the officers' seizure of the defendant's belongings, which the officers directed him to leave behind in the motel room after they evicted him.  We add that we are aware of no justification for their directive.  Accordingly, the evidence the officers later obtained from their search of these belongings should be suppressed even though that search was conducted pursuant to a search warrant because--leaving aside for the moment the problem of the primary justification for the search warrant being the test results of the substance inside the small plastic bag that we earlier held was improperly seized--the belongings were still present in the motel room and capable of being searched only because the offi­cers unlawfully prohibited defendant from removing those belongings when he was evicted.

Accordingly, we hold that the police obtained the drugs, scales, documents, and packaging material illegally, and the trial court erred by denying defendant's motion to sup­press that evi­dence.  Because we have now concluded that the only evidence linking defendant to the crime charged should have been suppressed, we reverse and do not remand for further proceedings.

III. CONCLUSION

For the reasons stated, we reverse the trial court's judgment. 

Reversed.

GARMAN, J., and KNECHT, P.J., concur.