2020 IL App (1st) 17-1372-U

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

SECOND DIVISION
August 25, 2020

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | Appeal from the Circuit Court of |
| Respondent-Appellee, | ) | Cook County, Illinois, |
| | ) | Criminal Division. |
| v. | ) | |
| | ) | No. 10 CR 2876 |
| ANDRE RANKIN, | ) | |
| | ) | The Honorable |
| Petitioner-Appellant. | ) | Diane Cannon |
| | ) | Judge Presiding. |

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court.
Justices Lavin and Coghlan concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The trial court erred in summarily dismissing the petitioner's *pro se* postconviction petition where the petitioner made an arguable claim of appellate counsel's ineffectiveness, for counsel's failure to argue that the trial court erred in denying his motion to suppress evidence.

¶ 2    The petitioner, Andre Rankin, appeals from the summary dismissal of his *pro se* postconviction petition filed pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2016)).  On appeal, the petitioner contends that summary dismissal was improper where his petition stated an arguable claim that his direct appeal counsel was ineffective for failing to argue that the trial court improperly denied his motion to suppress

evidence. For the reasons that follow, we reverse and remand for further proceedings under the Act.

¶ 3                                    I. BACKGROUND

¶ 4        In February 2010, the petitioner was charged, *inter alia*, with armed habitual criminal (AHC) (720 ILCS 5/24-1.7(a) (West 2010), and unlawful use of a weapon by a felon (UUWF) (720 ILCS 5/24-1.1(a) (West 2010)) for having been found in possession of a handgun on January 21, 2010.

¶ 5        Prior to trial, the petitioner filed a motion to quash arrest and suppress evidence. At the hearing on this motion, the petitioner called his wife, Darlene Rankin. Darlene testified that on January 20, 2010, she lived at 1546 South Christiana Avenue with the petitioner, their son, Darlene's niece and her grandniece. A friend of Darlene's niece, Shavonne Doumassy (Shavonne), was also staying with them off and on for a couple of months. Shavonne paid rent to Darlene, but there was no lease agreement indicating how long she could stay.

¶ 6        On January 20, 2010, between 8 and 10 p.m., the petitioner had a conversation with Shavonne, in which he informed her that she could no longer stay in their residence. According to Darlene, the petitioner told Shavonne that she was lazy, that she was not paying enough rent, and that it was time for her to go. Shavonne left the house at about 2 a.m. that morning.

¶ 7        According to Darlene, Shavonne returned to the residence at around noon to retrieve some clothes and Darlene let her inside. A little later, Shavonne's mother, Veronica Duckwiley (Veronica), and Shavonne's cousin arrived to help Shavonne. Darlene allowed them into the residence as well.

¶ 8        Darlene testified that while Shavonne was collecting her things, the petitioner and

2

Veronica, got into an argument about the petitioner having kicked Shavonne out of the residence at 2 a.m. Veronica was cursing the petitioner and he yelled back at her. The petitioner told Veronica and Shavonne to leave but they refused. When the argument moved into the kitchen, Veronica grabbed a wooden knife from the counter and Darlene stepped between her husband and Veronica and asked Veronica and Shavonne to leave, but Veronica refused.

¶ 9 Darlene testified that "the next thing she knew" uniformed police officers with guns drawn were storming into her residence. She did not know that the police had been called and did not know whether they knocked before entering. She did not give the police permission to enter her residence and they did not have a search warrant. She acknowledged, however, that immediately before the police entered the residence, the petitioner and Veronica were screaming at each other.

¶ 10 Darlene averred that Veronica immediately told the police that the petitioner had pulled a gun on her and that he had gone to the back room with the gun. Darlene denied that the petitioner ever had a gun inside the house or that he threatened Veronica or anyone else with it. She also denied that he ever went into their bedroom. Instead, Darlene testified that the petitioner was still in the kitchen when the police arrived, and that they immediately handcuffed him and told him to sit down. The officers then proceeded to Darlene's son's bedroom, handcuffed him, and brought him into the kitchen. At that point, the police made Darlene sit down and then proceeded to search the bedroom that she shared with the petitioner and where Veronica had told them the petitioner had taken the gun. About 15 minutes later, the officers returned with a handgun, stating that they had found it inside their bedroom. Darlene stated that she had never seen the handgun before.

¶ 11 The State called Chicago Police Sergeant Jane Raddatz. She testified that before 11 a.m. on

January 21, 2010, she received a dispatch of a man with a gun at 1546 South Christiana Avenue. She proceeded to the address where she was joined by Sergeant Whiteside.

¶ 12    Sergeant Raddatz testified that as she exited her vehicle and approached the residence, she heard yelling coming from inside. Sergeant Raddatz knocked on the door. A woman, whom the sergeant later identified as Veronica, quickly opened the door, pointed at the petitioner, and shouted that he had threatened her with a gun.

¶ 13    Sergeant Raddatz explained that the residence consisted of a combination kitchen and living room on the right and a hallway leading straight down to a couple of bedrooms and a bathroom, which were about 15 to 20 feet away. She stated that when Veronica opened the door, she could see the petitioner standing midpoint in the hallway. The petitioner's back was towards the sergeant, and when she yelled "Sir," at him, he ignored her and proceeded to one of the back bedrooms. Sergeant Raddatz acknowledged that she could see the petitioner's hands and that he was not holding a weapon.

¶ 14    About 20 seconds later, Sergeant Raddatz observed the petitioner exit the bedroom and head down the hallway back towards the living room and kitchen area. Sergeant Raddatz instructed the petitioner to show her his hands and he immediately obliged. He had no weapon on his person. Sergeant Raddatz handcuffed the petitioner and patted him down for her own safety and everyone else's. She explained that at this point, she believed she was justified in detaining the petitioner "on aggravated assault" based upon Veronica's allegations.

¶ 15    At this point more officers had arrived at the scene and Sergeant Raddatz directed Officer Garcia to the bedroom in which the petitioner had been. The sergeant told Officer Garcia that she had observed the petitioner entering that bedroom for a short period of time. She also told

Officer Garcia that Veronica had claimed that the petitioner had threatened her with a gun and then took it to that same bedroom. According to Sergeant Raddatz, only a couple of minutes later Officer Garcia returned with a handgun. Sergeant Raddatz was informed that the handgun was retrieved from a shoe that was inside a closet in the bedroom, from which the petitioner had emerged.

¶ 16     On cross-examination, Sergeant Raddatz denied that she brandished her weapon when she entered the residence. The sergeant also acknowledged that even though Veronica had told her that the petitioner had threatened her with a gun, she did not follow the petitioner into the bedroom or draw her weapon when she saw him in the hallway. Sergeant Raddatz explained that she was not afraid for her safety, and particularly not afraid of the petitioner since she could see that he did not have a weapon on his person. She stated, however, that she "did not want to just run past a bunch of combative people" who could also possibly be armed. Therefore, she explained, she remained in the living room watching everyone until backup arrived.

¶ 17     After hearing this evidence, the trial court denied the petitioner's motion to quash arrest and suppress evidence on the basis of "witness credibility." In doing so, the court found that both Darlene and the sergeant had testified that the police responded to a call of a man with a gun. In addition, the court found relevant that the sergeant had testified that once at the scene, she "not only heard screaming," but was "allowed into the residence by the victim who said—pointed at the [petitioner] and said he just pointed a gun at me." According to the trial court, the sergeant further testified that while waiting for back up, she observed the petitioner walking into a back room, after which she detained him, and instructed other officers to search that room, from which a handgun was recovered. As the court explained, based on this testimony:

"[t]he officers did have probable cause to respond to the call of a man with a gun, knock on the door after they heard the screaming at the residence where the call came from.

And they had a right and a duty to respond to the victim of aggravated assault who just told the police officer face to face he just threatened to kill me with a gun."

¶ 18    The petitioner filed a motion to reconsider, arguing that his arrest had been unjustified. Alternatively, the petitioner argued that even if the arrest had been justified, the warrantless search of his bedroom was unjustified where the police had no consent to enter the residence, the search was not a valid search incident to arrest, any exigent circumstances dissipated once he was handcuffed and detained in the kitchen, and the search was not a part of a valid protective sweep. The trial court denied the petitioner's motion.

¶ 19    The petitioner subsequently proceeded with a jury trial. The State called four witnesses: Veronica, Sergeant Raddatz and Chicago Police Officers Garcia and Harris.

¶ 20    Veronica testified that on January 21, 2010, at approximately 11 a.m., she and her daughter, Shavonne, were at the petitioner's apartment at 1536 South Christiana Avenue. Shavonne had been living at the apartment, but the petitioner had asked her to move out. Veronica was at the apartment that day to help Shavonne move out. While there, Veronica and the petitioner had an argument, which took them from the bedroom into the kitchen area. Veronica testified that during the argument, the petitioner threatened her and then pulled a handgun from his pocket or waistband, after which he waved the gun around and threatened Veronica with it. Veronica called 911. The police arrived approximately five minutes after Veronica's 911 call. Veronica let them into the apartment and told them the petitioner had pointed a gun at her.

¶ 21    Consistent to her testimony at the motion to suppress hearing, Sergeant Raddatz testified that,

as she approached the apartment, she heard arguing and loud voices coming from inside. She knocked on the door and Veronica let her inside. Veronica told Sergeant Raddatz that a man had threatened her and her daughter with a gun, and that he went to the back of the apartment when he heard the knock on the door. Veronica gestured down the hallway of the apartment leading to the petitioner's bedroom. Sergeant Raddatz saw the petitioner walking down the hallway. The petitioner had nothing in his hands at that time. Although Sergeant Raddatz yelled at the petitioner, he did not stop, but instead entered the back bedroom. According to the sergeant, the petitioner came back out about 20 seconds later. Sergeant Raddatz handcuffed the petitioner and sat him at the kitchen table, and Officers Garcia and Harris searched the bedroom.

¶ 22    Officer Garcia testified that together with her partner, Officer Gonzalez, at about 11 a.m. on January 21, 2010, she responded to a call of a man with a gun at 1546 South Christiana Avenue. When the two officers arrived at the scene, they met two individuals exiting the residence, who attempted to tell them what had happened. Officer Garcia testified that once inside the residence, she observed two police sergeants and another "responding unit," as well as the suspect, who was already seated in the kitchen, handcuffed and in custody.

¶ 23    Officer Garcia testified that after she spoke to Sergeant Raddatz she proceeded to the back bedroom to search for "the weapon in question." There, she discovered a .380 semiautomatic handgun protruding from a shoe in the closet of the back bedroom. She testified that "[t]he bedroom door was open, and immediately, as I walked in, to my left there was a closet door. The light was on. It was well lit, and the door was open, and immediately on the floor was a pair of white gym shoes, and in one white gym shoe was the firearm." She went on to describe how the firearm was positioned in the shoe: "I saw the back of the firearm, the stub area sticking out."

Upon inspection, Officer Garcia noted that the handgun was loaded with one cartridge containing six rounds of live ammunition

¶ 24    Officer Garcia further testified that, after the petitioner was transferred to the police station and given his *Miranda* rights, he voluntarily gave a statement regarding the gun.  At the police station, the petitioner admitted that the gun belonged to him.  According to Officer Garcia, he explained that he purchased the gun from a man on the street for $200, that he kept it for protection, and that he stored it in a gym shoe in his bedroom.  The petitioner also admitted that the ammunition was his, explaining that it was "laid out" because he was in the process of moving

¶ 25    Officer Ghenghis Harris next testified that together with his partner Officer John Guettler, at around 11 a.m. on the date in question he responded to a dispatch regarding a man with a gun by proceeding to the petitioner's address.  Once there, the two officers proceeded to enter the building from the rear.  They were allowed into the residence by other police officers who had already secured the scene.  From his entry into the hallway from the rear door, Officer Harris could immediately see that the petitioner was already handcuffed and seated in the kitchen area.  Officer Harris testified that he searched the petitioner's bedroom with Officer Garcia.  Inside, he found one box containing 25 rounds of live .380 caliber ammunition on top of a dresser, as well as 3 fully loaded cartridges on top of the bed.

¶ 26    The handgun, ammunition and cartridges, and Veronica's 911 call were introduced as evidence at trial.  For purposes of the UUWF charges, the parties stipulated that the petitioner had a previous felony conviction.  For purposes of the AHC charge, the parties additionally

stipulated that the petitioner had two previous qualifying felony convictions. The nature of these previous felony convictions was not introduced as evidence at trial.

¶ 27    The petitioner next testified in his own defense. He stated that, prior to his arrest, he was a substance abuse counselor at Haymarket Center. He lived in his apartment along with his wife, their son, a niece and her daughter. In addition, at the time of his arrest, Shavonne had been staying with them. The night before the arrest, the petitioner told Shavonne that she had to move out because he thought she was taking advantage of his wife's generosity. He told her to be gone when he returned. He returned a few hours later, in the middle of the night, and discovered that she was still there. He woke her up and again told her to leave. She did so. She and her mother, Veronica, returned the next morning around 11 a.m. The petitioner acknowledged that he and Veronica got into an argument about his having told Shavonne to leave. He testified that Veronica and Shavonne refused to leave the apartment.

¶ 28    The petitioner denied having drawn a gun. He also denied knowing that there was a gun or ammunition in his apartment. He further testified that the police never advised him of his *Miranda* rights. He claimed that, at the police station, he told the officers that he did not own a gun and denied having told them that he had purchased the gun for $200. He claimed that he had never seen the gun that the police alleged to have recovered in his apartment.

¶ 29    Based upon the aforementioned evidence, the jury found the petitioner guilty of UUWF and AHC. The petitioner filed a posttrial motion, arguing, *inter alia*, that the trial court erred in denying his motion to suppress evidence. After that motion was denied, the court proceeded to sentencing. A sentence of ten years imprisonment was imposed on the AHC conviction. No sentence was imposed for the UUWF conviction.

¶ 30      The petitioner appealed.  On direct appeal, the petitioner's appointed counsel raised only two issues: (1) that the AHC and UUWF statutes were facially unconstitutional; and (2) that the trial court had erroneously considered an element of the offense as an aggravating sentencing factor.  This court affirmed the petitioner's conviction and sentence.  See *People v. Rankin*, 2013 IL App (1st) 120522-U

¶ 31      The petitioner subsequently filed the instant *pro se* postconviction petition, arguing, *inter alia,* that his direct appeal counsel was ineffective for failing to argue that the trial court erred when it denied his motion to suppress evidence.  The trial court summarily dismissed the petition as frivolous and patently without merit.   In doing so, the trial court found that the petitioner had not suffered any prejudice from appellate counsel's failure to raise this particular issue on appeal because the issue was meritless.  The court "declined" to deem patently erroneous appellate counsel's assessment of the record and decision not to raise that issue.  In addition, the court found that the petitioner had failed to establish that it was arguable that had appellate counsel raised this issue, his conviction would have been reversed.  The petitioner now appeals.

¶ 32                                    II.  ANALYSIS

¶ 33      On appeal, the petitioner contends that the trial court erred in summarily dismissing his *pro se* postconviction petition at the first stage of postconviction proceedings.  He argues that contrary to the trial court's findings, his petition presented an arguable constitutional claim of ineffective assistance of appellate counsel, where counsel failed to argue on direct appeal that the trial court erred in denying his motion to suppress evidence.  For the reasons that follow, we agree.

¶ 34      The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq*. (West 2016)) provides a

three-step process by which a convicted defendant may assert a substantial denial of his or her constitutional rights in the proceedings that led to the conviction. *People v. Edwards*, 2012 IL 111711, ¶ 21; *People v. Tate*, 2012 IL 112214, ¶ 8; see also *People v. Walker*, 2015 IL App (1st) 130530, ¶ 11 (citing *People v. Harris*, 224 Ill. 2d 115, 124 (2007)). A proceeding under the Act is a collateral attack on a prior conviction and sentence and is therefore "not a substitute for, or an addendum to, direct appeal." *People v. Kokoraleis*, 159 Ill. 2d 325, 328 (1994); see *Edwards*, 2012 IL 111711, ¶ 21; *People v. Barrow*, 195 Ill. 2d 506, 519 (2001). Accordingly, any issues that were decided on direct appeal are *res judicata*, and any issues that could have been presented on direct appeal, but were not, are waived. *Edwards*, 2012 IL 111711, ¶ 21; see also *People v. Reyes*, 369 Ill. App. 3d 1, 12 (2006).

¶ 35   At the first stage of a postconviction proceeding, such as here, the trial court must independently review the petition, taking the allegations as true, and determine whether " 'the petition is frivolous or is patently without merit.' " *People v. Hodges*, 234 Ill. 2d 1, 10 (2009) (quoting 725 ILCS 5/122–2.1(a)(2) (West 2006)); see also *Tate*, 2012 IL 112214, ¶ 9. At this stage of postconviction proceedings, the court may not engage in any factual determinations or credibility findings. See *People v. Plummer*, 344 Ill. App. 3d 1016, 1020 (2003) ("The Illinois Supreme Court *** [has] recognized that factual disputes raised by the pleadings cannot be resolved by a motion to dismiss at either the first stage *** or at the second stage *** [of postconviction proceedings], rather, [they] can only be resolved by an evidentiary hearing ***.") see also *People v. Coleman*, 183 Ill. 2d 366, 380-81 (1998) (Noting that the supreme court has "foreclosed the circuit court from engaging in any fact-finding at a dismissal hearing because all well-pleaded facts are to be taken as true at this point in the proceeding."). Instead, the court

may summarily dismiss the petition only if it finds the petition to be frivolous or patently without merit. See *People v. Ross*, 2015 IL App (1st) 120089, ¶ 30; see also *Hodges*, 234 Ill. 2d at 10. A petition is frivolous or patently without merit only if it has no arguable basis either in law or in fact. *Tate*, 2012 IL 112214, ¶ 9. Our supreme court has explained that a petition lacks an arguable basis where it "is based on an indisputably meritless legal theory or a fanciful factual allegation"—in other words, an allegation that is "fantastic or delusional," or is "completely contradicted by the record." (Internal quotation marks omitted.) *Hodges*, 234 Ill. 2d at 13, 16; *People v. Brown*, 236 Ill. 2d 175, 185 (2010); see also *Ross*, 2015 IL App (1st) 120089, ¶ 31. We review the first stage summary dismissal of a petition *de novo*. *Tate*, 2012 IL 112214, ¶ 10.

¶ 36    Claims of ineffective assistance of appellate counsel, such as the one raised here by the petitioner, are resolved under the same two-prong standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984) for ineffective assistance of trial counsel claims. See *People v. Upshaw*, 2017 IL App (1st) 151405, ¶ 54; see also *People v. Lacy*, 407 Ill. App. 3d 442, 456 (2011); see also *People v. Colon*, 225 Ill. 2d 125, 135 (2007) (citing *People v. Albanese*, 104 Ill. 2d 504 (1984) (adopting *Strickland*)). Under this standard, the petitioner must establish that appellate counsel's failure to raise an issue on appeal was both: (1) objectively unreasonable; and (2) that he was prejudiced as a result of that decision. See *Upshaw*, 2017 IL App (1st) 151405, ¶ 54; *Lacy*, 407 Ill. App. 3d at 456; see also *People v. Ward*, 371 Ill. App. 3d 382, 434 (2007) (citing *Strickland*, 466 U.S. at 687-94)). While counsel will be deemed constitutionally ineffective if he or she fails to raise a meritorious issue, counsel is not obligated to brief every conceivable issue on appeal and will not be deemed incompetent if in counsel's judgment that issue was without merit, unless counsel's appraisal of the merits is patently wrong. *People v. Easley*, 192 Ill. 2d

307, 329 (2000); *Upshaw*, 2017 IL App (1st) 151405, ¶ 54; see also *People v. Harre*, 263 Ill. App. 3d 447, 454 (1994) ("Where the trial court's denial of defendant's motion to suppress [i]s not a patently meritorious issue, defendant's appellate counsel [i]s not ineffective for failing to raise the issue on direct appeal"). To show that he was prejudiced by appellate counsel's failure to raise an issue on appeal the petitioner must establish that " 'there is a reasonable probability that, but for appellate counsel's errors, the appeal would have been successful.' " *Upshaw*, 2017 IL App (1st) 151405, ¶ 54 (quoting *People v. Golden*, 229 Ill. 2d 277, 283 (2008)).

¶ 37    In the context of a first stage postconviction proceeding, such as the one here, a petitioner need only show that he can *arguably* meet the two-prong *Strickland* standard. *People v. Wilson*, 2013 IL (1st) 112303, ¶ 20; see also *Hodges*, 234 Ill. 2d at 17. In other words, the petitioner must only show that: (1) it is *arguable* that appellate counsel's performance was objectively unreasonable and (2) it is *arguable* that the outcome of his appeal would have been different absent counsel's failure to raise the issue on appeal. *Id*.

¶ 38    For the reasons that follow, in the present case, we find that the petitioner has met this low threshohold. As shall be discussed in more detail below, where it is undisputed that the only evidence of the petitioner's guilt (including the recovered handgun, and the petitioner's confession to having owned and possessed it) came about as a result of an arguably improper search, we are compelled to conclude that appellate counsel's failure to raise the impropriety of that search on appeal arguably constituted ineffective assistance of counsel, so as to permit the petitioner to proceed to second stage postconviction review.

¶ 39    It is axiomatic that in reviewing a trial court's decision to deny a motion to suppress evidence

on the basis of an allegedly improper search, we use a bifurcated standard of review. *People v. Luedemann,* 222 Ill. 2d 530, 542 (2006). With respect to questions of fact, we defer to the trial court's findings and reverse them only if they are contrary to the manifest weight of evidence. *Id.* On the other hand, the question of whether, based on the facts as found by the trial court, suppression was warranted, is a legal question we review *de novo. Id.*

¶ 40    The fourth amendment of the United States Constitution protects the rights of people "to be secure in their persons, houses, papers, and effects, against unreasonable search and seizures." U.S. Const. amend. IV. The Illinois Constitution offers similar protection. Ill. Const. 1970, art. 1, § 6. A warrantless search is *per se* unconstitutional unless it falls within recognized exceptions to the warrant requirement. *Katz v. United States,* 389 U.S. 347, 357 (1967). In Illinois the relevant exceptions are: (1) probable cause accompanied by exigent circumstances; (2) a search incident to arrest; (3) a protective sweep; and (3) a search based on consent. *People v. Harrell,* 226 Ill. App. 3d 866, 872 (1992). Once a defendant challenges a warrantless search, it becomes the State's burden to show that the search falls into one of these well-defined exceptions. See *People v. Rushing*, 272 Ill. App. 3d 387, 391 (1995).  If the State fails to meet its burden, the evidence seized during the search must be suppressed at trial.  *Id*.

¶ 41    In the present case, it is undisputed that the petitioner did not give the police consent to either enter his home or search his bedroom.  Accordingly, the search was justified only if it was incident to arrest, there was probable cause accompanied by exigent circumstances, or the situation necessitated a protective sweep.  For the reasons that follow, we find that the record does not indisputably establish any of these three exceptions, so as to have justified appellate counsel's decision not to challenge the trial court's denial of the petitioner's motion to suppress

evidence on direct appeal. See *People v. Petrenko*, 237 Ill. 2d 490, 499 (2010) (To succeed at the first stage of postconviction proceedings, the petitioner must only establish that his claim of ineffective assistance of appellate counsel is not based on either an indisputably meritless legal theory or a factual allegation that is clearly baseless, fantastic or delusional).

¶ 42    We begin by addressing the search incident to arrest exception. Under this exception, the police may, upon lawfully arresting a person inside his home, search the area within the suspect's "immediate control" from which he might obtain a weapon or destroy incriminating evidence. *Chimel v. California,* 39 U.S. 752 (1969). The rationale is that:

> "When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape. Otherwise, the officer's safety might well be endangered, and the arrest itself frustrated. In addition, it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction."

Nonetheless, the exception is narrowly limited and the area within the "immediate control" of the suspect most often extends only to the room in which he is arrested. As the Supreme Court has explained:

> "*There is no comparable justification, however, for routinely searching any room other than that in which an arrest occurs*—or, for that matter, for searching through all the desk drawers or other closed or concealed areas in that room itself. Such searches, in the absence of well-recognized exceptions, may be made only under the authority of a search warrant."
> (Emphasis added.) *Id.* at 762–63.

¶ 43    In the present case, it is uncontroverted that at the time the petitioner's bedroom was searched, the petitioner was detained and held in the kitchen area, which was on the opposite end of the hallway, some 15 to 20 feet away from the bedroom. Therefore, the petitioner was by no means in the "immediate control" of either the bedroom or the weapon that was discovered there. As such, it is certainly arguable that the search incident to arrest exception did not justify the officer's warrantless search of that bedroom.

¶ 44    In reaching this conclusion, we find the decision in *People v. Franklin*, 2016 IL App (1st) 140059, directly on point. In that case, police officers went to the defendant's hotel room after being informed that a person who allegedly committed a recent theft, and who was possibly armed, was staying in the room. *Franklin*, 2016 IL App (1st) 140059, ¶ 2. The defendant allowed the officers into the room, where they found an individual matching the description of the suspect in the theft, as well as observed drugs on the nightstand. *Id*. ¶ 3. The officers conducted a quick search of the hotel room and the bathroom and noted that none of the ceiling tiles in the bathroom were out of place. *Id*. The suspect in the theft then fled from the room, and the officers gave chase leaving the defendant in the hotel room. *Id*. ¶ 4.

¶ 45    When one of the officers returned to the hotel room, he observed the defendant exiting the bathroom. *Id*. He also observed one of the ceiling tiles in the bathroom had been displaced. *Id*. The officer handcuffed the defendant and had him sit on the bed, and then searched the bathroom, upon which he discovered two guns and cash hidden in the ceiling. *Id*.

¶ 46    On appeal, this appellate court held that the warrantless search of the bathroom was unlawful and that the items had to be suppressed. *Id*. ¶ 32. Relying on the rationale of the United States Supreme Court in *Chimel*, the *Franklin* court held that because the bathroom was separate from

the room where the defendant was arrested, the search could not be justified as incident to arrest. *Id*. ¶ 25.

¶ 47    Applying *Franklin* to the facts of this case, we similarly find that the search of the petitioner's bedroom, while he was detained in the kitchen, at least 15 to 20 feet away, was unjustified under the search incident to arrest exception. *Id*. ¶ 25. Accordingly, it is in the very least arguable that counsel's decision not to make this argument on appeal constituted ineffective assistance.

¶ 48    The State alternatively argues that even if the search was not justified as incident to arrest, exigent circumstances nonetheless supported the search. We disagree.

¶ 49    It is axiomatic that the police may perform a warrantless search when there is compelling need for prompt action by the police and time does not permit the police to obtain a warrant. See *Franklin*, 2016 IL App (1st) 140059, ¶ 26. The cornerstone of any exigency analysis is whether the police officers acted reasonably. *People v. Wimbley*, 314 Ill. App. 3d 18, 24 (2000); see also *People v. Williams,* 161 Ill. 2d 1, 26 (1994). In making such a determination, we consider a number of factors, including whether: (1) the offense under investigation was recently committed; (2) there was any deliberate or unjustifiable delay by the officers during which time a warrant could have been obtained; (3) a grave offense was involved, particularly one of violence; (4) the suspect was reasonably believed to be armed; (5) the police officers were acting upon a clear showing of probable cause; (6) there was a likelihood that the suspect would have escaped if not swiftly apprehended; (7) there was a strong reason to believe that the suspect was on the premises; and (8) the police entry, though nonconsensual, was made peaceably. *Williams,* 161 Ill. 2d at 26. Our supreme court has repeatedly held that these factors are not cardinal maxims,

but rather guidelines, and that not all factors will necessarily apply to every given situation. *Id*. Rather, in determining the presence of exigent circumstances, we must evaluate each case based upon the totality of the circumstances confronting the officers at the time the warrantless entry was made. *Wimbley*, 314 Ill. App. 3d at 24.

¶ 50    In the present case, consideration of the totality of the circumstances in the context of the aforementioned factors, shows that the State failed to establish exigent circumstances to justify the warrantless search of the petitioner's bedroom. Although exigent circumstances may have justified the officers' initial entry into the residence, and their detaining of the petitioner after Veronica's allegations, they did not justify the separate search of his bedroom after he had already been patted down, handcuffed and placed into custody. At that point, contrary to the State's position, the police already knew that the petitioner, by Sergeant Raddatz's own account was fully cooperating, was unarmed, and posed no danger to anyone else. There was also no fear that the petitioner could quickly escape since he had already been apprehended and placed into custody. In addition, there was no evidence of a grave crime, let alone one involving actual violence, having been committed. Sergeant Raddatz never saw the petitioner with a weapon either before or after he entered the bedroom and the petitioner was not combative. In fact, Sergeant Raddatz acknowledged that based on Veronica's allegations she believed she could detain the petitioner on aggravated assault, which in Illinois qualifies as a misdemeanor offense. See 720 ILCS 5/12-1, 12-2(c)(1),(d) (West 2020).

¶ 51    Moreover, even though it is true that Sergeant Raddatz testified that the scene was initially "chaotic," that "there was a lot of yelling and screaming going on," and that she did not know whether any other individuals in the residence were armed, she also acknowledged that the

search of the petitioner's bedroom was performed after backup had arrived, the petitioner was in custody and the residence had been secured by the police. Consistent with this testimony, Officers Garcia and Harris averred that at the time the search was performed, all of the individuals who had been inside the apartment were either in the living room and kitchen area or outside of the residence, and that the residence itself was being secured by at least seven police officers. Accordingly, even if the police had probable cause to believe that the petitioner had hidden a weapon inside his bedroom, once the residence was secure and the petitioner was in custody, no exigent circumstances justified the subsequent search of his bedroom without a warrant. *See Coolidge v. New Hampshire,* 403 U.S. 443,468 (1971) ("[N]o amount of probable cause can excuse a warrantless search absent 'exigent circumstances.' ").

¶ 52      In this respect, we again find the decision of this appellate court in *Franklin* instructive. There, we held that while the police may have had probable cause to believe that the defendant, who was observed leaving the bathroom after having disturbed several ceiling tiles, had hidden contraband there, because the defendant was already handcuffed and in custody in the hotel's bedroom when that bathroom was searched, no exigent circumstances justified the search of that bathroom without a warrant. *Id*. ¶ 30. The same rationale applies to the facts of this case.

¶ 53      For this same reason, we also find unavailing the State's argument that the search was justified as a protective sweep. A "protective sweep" is a quick and limited search of the premises, incident to an arrest and conducted to protect the safety of police or others. *Maryland v. Buie,* 494 U.S. 325, 327 (1990). To be justified, the sweep must be narrowly confined to a cursory visual inspection of those places in which a person may be hiding and must last "no longer than is necessary to dispel the reasonable suspicion of danger. " *Buie,* 494 U.S. 335-36.

In addition, the searching officers must possess "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area swept harbors an individual posing a danger to those on the arrest scene." *Id.*

¶ 54     In the present case, the record uncontrovertibly establishes that the police did not search the bedroom as part of a protective sweep. Sergeant Raddatz affirmatively stated that she directed Officer Garcia to the petitioner's bedroom to search for a gun. Both Officers Garcia and Harris testified at trial that they entered the petitioner's bedroom to search for a weapon, and not to see if any other individuals were hiding there. As such, the search undoubtedly went beyond a mere cursory visual inspection of those places where a person may be hiding. *Buie,* 494 U.S. 335-36.

¶ 55     More importantly, at the time the bedroom was searched, the police had no "reasonable belief *based on specific and articulable facts* that the area to be swept harbor[ed] an[y] individual posing a danger to those on the arrest scene." *Buie*, 494 U.S. at 337. Sergeant Raddatz affirmatively testified at the suppression hearing that she never felt afraid for her safety. Moreover, as already detailed above the combined testimony of all three police officers established that before Sergeant Raddatz directed Officer Garcia to search the petitioner's bedroom for the gun, the petitioner was already in custody and cooperating, and the remaining individuals in the residence were either compliantly sitting in the living room or were outside. See *Rushing*, 272 Ill. App. 3d 392-93 (holding that a warrantless search of the defendant's bedroom for a gun he allegedly used to threaten his brother was not justified as a protective sweep where the defendant was already in custody and there was no evidence that his family posed any risk to the officers).

¶ 56    Given the lack of justification for the search, in the very least, it is arguable that the trial court erred in denying the petitioner's motion to suppress evidence and that appellate counsel's failure to raise this issue on appeal constituted ineffective representation. Accordingly, we reverse and remand for further proceedings under the Act.

¶ 57    In doing so, however, we reject the petitioner's request that on remand the case be reassigned to a different trial judge, as we find that the judge's comments in no way reflect that she improperly prejudged any issue in this case. See *People v. Hall,* 157 Ill.2d 324, 331 (1993) ("There is no absolute right to a substitution of judge at a postconviction proceeding."); *People v. Reyes*, 369 Ill. App. 3d 1, 25 (2006) (quoting *People v. Vance*, 76 Ill. 2d 171, 179 (1979) (" 'To conclude that a judge is disqualified because of prejudice is not * * * a judgment to be lightly made.")

¶ 58                                III.  CONCLUSION

¶ 59    For the aforementioned reasons, we reverse the trial court's judgment summarily dismissing the *pro se* postconviction petition and remand for further proceedings in accordance with the Act.

¶ 60    Reversed and remanded.